MICHAEL BARNES (State Bar No. 121314)
IAN R. BARKER (State Bar No. 240223)
SONNENSCHEIN NATH & ROSENTHAL LLP
525 Market Street, 26th Floor
San Francisco, CA 94105-2708
Telephone: (415) 882-5000
Facsimile: (415) 882-0300

Emails: mbarnes@sonnenschein.com
       ibarker@sonnenschein.com

ROBERT W. HAYES (*pro hac vice* application to be filed)
COZEN O'CONNOR
1900 Market Street
Philadelphia, PA 19107
Telephone: (215) 665-2000
Facsimile: (215) 665-2013

Email: rhayes@cozen.com

Attorneys for Plaintiff
BEL CONOR INTERNATIONAL, LTD.

**FILED**

SEP 2009

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**E-filing**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO/OAKLAND DIVISION

| | |
|---|---|
| BEL CONOR INTERNATIONAL, LTD., a foreign corporation incorporated in Hong Kong,<br><br>    Plaintiff,<br><br>vs.<br><br>SOLTA MEDICAL, INC., a Delaware Corporation,<br><br>    Defendant. | Case No. CV 09 4391<br><br>**COMPLAINT FOR PRELIMINARY INJUNCTION** |

Plaintiff Bel Conor International, Ltd. alleges as follows:

## THE PARTIES

1.    Plaintiff Bel Conor International, Ltd. ("Bel Conor") is a foreign corporation

organized and existing under the laws of Hong Kong with its principal place of business at Unit

501, 5th Floor, Yue Xiu Building, 160-174 Lockhart Road, Wanchai, Hong Kong.

SONNENSCHEIN NATH & ROSENTHAL LLP
525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105
(415) 882-5000

2. Defendant, Solta Medical, Inc. ("Solta") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 25881 Industrial Boulevard, Hayward, California 94545.

3. Solta is a manufacturer and developer of transformational aesthetic products, procedures and services. Solta was previously named Thermage, Inc., a manufacturer and developer of non-invasive radio-frequency skin tightening and contouring medical devices. (In this Complaint, defendant shall be referred to as "Solta" even for those periods during which it operated as Thermage.)

4. Bel Conor was formed for the sole purpose of distributing the Solta product line in China.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the plaintiff is a citizen and resident of a foreign country and defendant is a citizen and resident of the United States, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) in that defendant resides in this District and regularly conducts business in this District.

## INTRADISTRICT ASSIGNMENT

7. The events at issue in this case arose in the County of Alameda. Accordingly, the action should be assigned to the San Francisco/Oakland Division as set forth in Civil L.R. 3-2(d).

## BACKGROUND

### The Formation Of Bel Conor

8. In late 2002, Solta introduced the ThermaCool System to the market. This system is a medical device that tightens and contours the skin through a patented process for volumetric heating deep into the dermis and subcutaneous tissue.

9. The ThermaCool System includes a unit containing an RF generator, cooling unit and system software and ThermaTips disposable individual applicators for each patient that deliver the System's energy pulse to the dermis.

CASE NO.                                   -2-                          COMPLAINT FOR
                                                              PRELIMINARY INJUNCTION

SONNENSCHEIN NATH & ROSENTHAL LLP
525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105
(415) 882-5000

1    10.    The ThermaCool treatment can only be administered by a physician, who must be

2    specially trained to use this system.

3    11.    The original version of the ThermaCool System was branded the ThermaCool TC.

4    Solta has since introduced the ThermaCool NXT, an improved version of the ThermaCool System,

5    to the market, and just recently released the Thermage CPT System.

6    12.    In 2006, Solta entered into discussions with the principals of B&J Dental Group

7    ("B&J Dental") and Michael Yam, a businessman with over twenty years' experience in the

8    medical device market in China, to distribute the ThermaCool System in China. Dr. Tinny Ho, a

9    dermatologist that had utilized the ThermaCool System in her practice in Hong Kong for several

10    years, also became involved in these discussions.

11    13.    B&J Dental operates a private medical center in the Embassy District in Beijing and

12    has extensive relationships with numerous other medical groups throughout China.

13    14.    The parties developed a business plan for B&J Dental's principals, Mr. Yam and Dr.

14    Ho to form a separate company and utilize B&J Dental's contacts to sell the ThermaCool System

15    directly to medical centers throughout the country.    It was contemplated that B&J Dental would

16    finance these purchases.

17    15.    As the ThermaCool System is a medical device, it could not legally be marketed or

18    utilized in China unless the Chinese State Food and Drug Administration ("SFDA") approved its

19    use.

20    16.    In China, companies usually engage experienced agents to submit applications to

21    approve new medical devices to the SFDA. Solta represented that an agent it had engaged had

22    submitted an application in October 2005 to approve the ThermaCool TC for use in China, and

23    that it expected the SFDA to grant this application shortly.

24    17.    At Solta's urging, B&J Dental, working with Dr. Ho, began preparing to demonstrate

25    the ThermaCool System to physicians in China and to train interested physicians.

26    18.    In August 2006, Solta advised that it had learned that its Application for Approval of

27    the ThermaCool TC had apparently been lost in the bureaucracy of the SFDA, and that it had

28    decided to submit a renewed application while it continued to track the original application.

CASE NO.                                    -3-                                    COMPLAINT FOR
                                                                        PRELIMINARY INJUNCTION

SONNENSCHEIN NATH & ROSENTHAL LLP
525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105
(415) 882-5000

19. Claiming that a renewed application should be granted within ninety days, Solta insisted that the principals of B&J Dental continue with their marketing and training program and promptly execute a distributorship agreement if they still wished to work with it, otherwise Solta was going to award the distributorship to other interested parties.

20. B&J Dental's principals elected to proceed, and together with Dr. Ho and Mr. Yam, formed Bel Conor to enter into a distributor agreement with Solta.

### The International Distributor Agreement

21. As of September 15, 2006, Bel Conor and Solta entered into an International Distributor Agreement granting Bel Conor the exclusive right to distribute any ThermaCool products in China for a three-year period (until September 15, 2009) (hereinafter, "Distributor Agreement"). (A true and correct copy of the International Distributor Agreement ["Distributor Agreement"] is attached, made a part hereof and marked Exhibit "A.")

22. In Section 8F, the Distributor Agreement specifies that:

> Distributor, at its own cost, shall be responsible for obtaining all government approvals, permits, registrations, licenses, exemptions and other permissions or clearances necessary and useful to the lawful distribution and use of the Products [ThermaCool System] in the Territory ("**Permits**"). Thermage will provide, at its cost, reasonable assistance and information to assist Distributor in obtaining such Permits.

(Id.)

23. Contrary to these specific provisions, even though Bel Conor tried to assume responsibility for pursuing the SFDA Application to approve the ThermaCool System, Solta refused to relinquish control of this process.

24. In August 2006, Solta caused the same agent that supposedly filed the October 2005 Application to resubmit the Application to approve the ThermaCool TC version of the ThermaCool System. Solta did not submit applications to approve the separate sale of ThermaTips or to approve the use of the NXT model of the ThermaCool System.

25. With the expectation that SFDA approval would be promptly obtained, and while Bel Conor was in the process of being incorporated, two ThermaCool TC model systems were purchased on its behalf to utilize as demonstration units. Bel Conor caused these demonstration

SONNENSCHEIN NATH & ROSENTHAL LLP
525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105
(415) 882-5000

1    systems to be installed at B&J Dental's medical center in Beijing, and at a clinic in Shenzhen.

2        26.   Within 60 days of the execution of the Distributor Agreement, Bel Conor purchased

3    two more ThermaCool TC model systems, and caused these additional demonstration units to be

4    installed at two other medical centers on the Mainland.

5        27.   In the second year of the contract, Bel Conor purchased a fifth ThermaCool TC

6    System.

7        28.   Bel Conor used its demonstration systems to train physicians so that there would be

8    physicians qualified to administer the ThermaCool treatment once the SFDA approved of its use.

9        29.   Throughout the course of it relationship with Solta, Bel Conor continuously marketed

10   and promoted the ThermaCool System by, among other things, conducting workshops,

11   demonstrating the System at medical conferences, directly marketing doctors at their offices and

12   advertising the System in medical publications.

13       30.   Bel Conor further, at all relevant times, maintained a significant staff, including but

14   not limited to, engineers, sales and marketing representatives, and training and installation

15   personnel.

16                              **Delays In The SFDA Approval Process**

17       31.   By the second quarter of 2007, the SFDA had not acted upon Solta's Application to

18   Register the ThermaCool TC.

19       32.   At this point, Solta finally involved Bel Conor in the application process. Bel Conor

20   thereafter assisted in this process, including by meeting with the SFDA.

21       33.   During this process, Bel Conor learned from SFDA officials that the agency had no

22   record of an application being submitted to approve the ThermaCool TC in October 2005, as Solta

23   had previously claimed.

24       34.   Bel Conor also learned that Solta had yet to submit all of the supporting

25   documentation, such as evidence of efficacy and safety of the product, necessary for the SFDA to

26   rule on the Application that had been submitted in August 2006.

27       35.   Bel Conor further learned that the pending Application to approve the ThermaCool

28   TC did not include the use of ThermaTips separately from the System, and that a separate

CASE NO.                              -5-                          COMPLAINT FOR
                                                          PRELIMINARY INJUNCTION

SONNENSCHEIN NATH & ROSENTHAL LLP
525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105
(415) 882-5000

application for approval needed to be filled to sell the ThermaTips separately from the System.

36. Bel Conor asked Solta for the missing documentation necessary to complete the application to approve the use of the ThermaCool TC.

37. It also began the process of preparing applications to approve the sale of ThermaTips separate from the System and of the NXT model of the ThermaCool System that Solta introduced after the Distributor Agreement was executed.

38. To support the Application for Thermatips, Bel Conor independently sponsored bio-processing testing of the ThermaTips necessary to meet the SFDA's requirement of demonstrating their safety. Bel Conor repeatedly requested that Solta provide other documentation necessary to meet the requirement of demonstrating the efficacy and safety of the ThermaTips and NXT model, including Thermage's ISO 13485 Certification and U.S. FDA 510(k) approval letters (granting approval to market these products in this country).

39. Since Bel Conor could not sell any products without government approval, and as approval had not yet been obtained, Bel Conor was unable to sell any products during the first 18 months of its distributorship.

40. Bel Conor accordingly requested that Solta execute a new three year distributor agreement that would be effective January 1, 2008. This would give Bel Conor the full three years it was promised to market the ThermaCool System in China, assuming the SFDA registered the product in the first quarter of 2008.

## The Parties' Agreement To Extend The Term Of The Original Distributor Agreement

41. On December 31, 2007, Solta agreed to negotiate a new three year distributor agreement with Bel Conor.

42. By that time, it would have been virtually impossible to negotiate a new agreement that would be effective by January 1, 2008. Therefore, Bel Conor requested that Solta agree to extend the term of the original Distributor Agreement for eighteen months, rather than negotiating a new contract.

SONNENSCHEIN NATH & ROSENTHAL LLP
525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105
(415) 882-5000

43. On January 1, 2008, Solta's duly authorized representative responded by email that Solta "agreed to do the 18 months extension instead of a new contract that starts from Jan. 1st. Actually, it is easier for Thermage, too."

44. The aforementioned e-mail effectuated an 18-month extension from the end of the contract, changing the contract termination date to March 15, 2011, so as to afford Bel Conor a three-year period to exclusively sell the ThermaCool TC in China, as it was originally promised under the Distributor Agreement (hereinafter, "the Extension" or "Extended Distributor Agreement").

## Completion of the Approval of the SFDA Process

45. As a direct and proximate result of Solta's failure to provide the information necessary to complete the Application to Approve the Use of the ThermaCool TC model until the first quarter of 2009, the SFDA did not approve the ThermaCool TC model for sale and use in China until February 20, 2009. However, Bel Conor did not receive notice of the approval until March 2009.

46. Once Bel Conor received notification of the SFDA's approval of the ThermaCool TC, it followed up with the contacts it made marketing the ThermaCool System in China while the Application was pending, and sold 13 units in just three months.

47. Despite Bel Conor's repeated requests, Solta never provided the documentation necessary to submit applications to sell ThermaTips separately or to approve the NXT model of the ThermaCool System.

## Solta's Change In Management Philosophy And Business Plans Leads To Solta's Calculated Attempt To Deny Bel Conor The Benefit Of Its Bargain

48. Upon information and belief, in late 2008, Thermage acquired Reliant Technologies, the pioneer of fractional laser resurfacing and developer of the Fraxel platform of lasers, and it was at this point that it changed its name to Solta.

49. Upon information and belief, as a result of corporate reorganizations incident to the

CASE NO.  -7-  COMPLAINT FOR
PRELIMINARY INJUNCTION

1   Reliant Technologies acquisition, by March 2009, new management personnel became responsible

2   for the international sales of the Thermage product line. This management team, upon information

3   and belief, decided that a start-up company was not the kind of entity it wanted for its China

4   distributor and that Bel Conor should not have been appointed Solta's distributor.

5       50.   The new management team accordingly advised that they did not intend to continue

6   using Bel Conor as Solta's exclusive distributor in China once the term of the Distributor

7   Agreement expired. It requested that the parties negotiate a new, limited distribution agreement

8   immediately.

9       51.   On April 29, 2009, about a month after Bel Conor had learned that the ThermaCool

10  TC model was finally approved by the SFDA for sale in China, Solta sent Bel Conor a proposal

11  for a new contract offering Bel Conor continued, exclusive distributorship rights in only two

12  provinces of China.

13      52.   Bel Conor rejected this offer, reminding Solta that its exclusive distribution rights for

14  all of China extended through March 2011.

15      53.   Solta initially denied that the Distributor Agreement had been extended. When Bel

16  Conor provided Solta with copies of the written confirmation of the Extension, Solta conceded the

17  existence of the Extension, but then took the position that this Extension had actually shortened

18  the term of the Agreement, so that it expired on June 30, 2009.

19      54.   Thereafter, by letter dated June 16, 2009 from William Brodie, Solta's Vice-President

20  for Global Sales, Solta purported to notify Bel Conor that it had breached the Distributor

21  Agreement.

22      55.   In this letter, Solta claimed that Bel Conor was required to sell twelve ThermaCool

23  Systems during each contract year and 288 ThermaTips in the first contract year, 1,392 in the

24  second contract year and 2,544 in the third contract year, but that Bel Conor had in total sold only

25  13 ThermaCool Systems and 589 ThermaTips.

26      56.   Solta also claimed that Bel Conor failed to submit and meet monthly sales forecasts

27  as supposedly required under the Distributor Agreement, or to employ a sufficient number of

28  suitably trained sales, marketing, installation or training personnel.

CASE NO.                                    -8-                        COMPLAINT FOR
                                                                       PRELIMINARY INJUNCTION

SONNENSCHEIN NATH & ROSENTHAL LLP
525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105
(415) 882-5000

1    57. In this letter, Solta further advised that it was increasing the purchase price for

2    ThermaCool TC Model Systems and enclosed what it claimed was its new International Price List

3    (hereinafter, "New Price List").

4    58. This New Price List reflected a price increase to the distributor for a single

5    ThermaCool TC model system from $32,210.75 to $150,000.00, an approximately five fold

6    increase. The New Price List reflected that the unit price for Solta's updated version of the

7    ThermaCool TC System (the NXT), which is not approved for sale in China, would actually be

8    lower than the original contract price for the ThermaCool TC System.

9    59. Bel Conor could not sell the ThermaCool TC System at the prices it would have to

10   charge if it were required to pay $150,000.00 for each System. Solta clearly realized this and

11   inflated the price in an effort to dissuade Bel Conor from continuing as its distributor.

12   60. After promising to attempt to resolve these issues, Solta simply ignored Bel Conor

13   and stopped filling its purchase orders. In response to Bel Conor's demand that its purchase

14   orders be honored, Solta finally responded that it considered the Distributor Agreement

15   terminated.

16   61. Bel Connor accordingly has no alternative but to pursue its right to enforce the

17   Distributor Agreement. In accordance with the arbitration clause in the Distributor Agreement,

18   Bel Conor will file a Statement of Claim with the American Arbitration Association seeking

19   specific performance of the Distributor Agreement and damages. However, as expressly

20   authorized under the Distributor Agreement, Bel Conor files a Complaint with the Court seeking a

21   preliminary injunction prohibiting Solta from terminating the Distributor Agreement, enforcing its

22   price increase and granting distribution rights to any other entity in China, during the pendency of

23   the parties' arbitration.

24                          **FIRST CLAIM FOR RELIEF**

25                    **BREACH OF CONTRACT (Specific Performance)**

26   62. Bel Conor incorporates by reference, as if fully set forth herein, Paragraphs 1 through

27   61 of this Complaint.

28   63. Bel Conor entered into a valid Distributor Agreement with Solta granting Bel Conor

CASE NO.                                    -9-                              COMPLAINT FOR
                                                                    PRELIMINARY INJUNCTION

SONNENSCHEIN NATH & ROSENTHAL LLP
525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105
(415) 882-5000

the exclusive right to distribute any ThermaCool products in China for a three-year period ending September 15, 2009.

64. By its express terms, the Distributor Agreement provided that it may be extended by "mutual written consent of the Parties." (Distributor Agreement, ¶ 9A, Exhibit A hereto.)

65. The January 1, 2008 email from Solta's duly authorized representative advising that Solta consented to the eighteen month extension constitutes "written consent" thereto and serves to satisfy this requirement.

66. As the term of the Distributor Agreement was extended to March 15, 2011, and the Distributor Agreement grants Bel Conor an exclusive distributorship in China, Solta's refusal to sell ThermaCool Systems to Bel Conor, and announcement that it intends to immediately grant other entities distribution rights in China, violates the Distributor Agreement.

67. Solta's claim that it is entitled to terminate the Distributor Agreement is a mere pretext to cover its change in business focus and strategy. Its allegations of breach are inconsistent with the unambiguous terms of the Agreement, without factual support and without reasonable basis.

68. As a matter of law, Bel Conor cannot be held to have breached the Distributor Agreement by failing to sell ThermaCool Systems and ThermaTips in China when it was illegal to do so. Further, the Distributor Agreement expressly provides that a "Party shall not be responsible or liable or deemed in breach for default hereof or be subject to any claim by another . . . because of its failure or omission to perform or delay in the performance of its obligations hereunder due a contingency beyond its control, such as . . . acts of government . . . judicial decisions." (Distributor Agreement, ¶ 15 B, Exhibit A hereto.)

69. The Distributor Agreement further provides that the sale of ThermaCool Systems will commence only after the SFDA approved of these systems and, therefore, under the terms of the contract, Bel Conor's minimum purchase obligations were not triggered until the SFDA approved of the ThermaCool System. The Distributor Agreement expressly requires Bel Conor to "comply fully with any and all applicable health and safety laws and regulations of the Territory as they relate to the Products and their uses," and that the parties shall to comply with law in the

CASE NO. -10- **COMPLAINT FOR PRELIMINARY INJUNCTION**

SONNENSCHEIN NATH & ROSENTHAL LLP
525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105
(415) 882-5000

1  performance of their obligations under the Agreement. (Distributor Agreement, §§ 8G and 15D,

2  Exhibit A hereto.)

3      70. Solta breached the Distributor Agreement by failing to relinquish control of the

4  SFDA application process to Bel Conor, to pursue the application process diligently, to submit

5  applications to approve the ThermaTips and the NXT model and to provide the supporting

6  documentation that Bel Conor repeatedly requested. As a direct and proximate result of Solta's

7  breaches of contract, approval to market and use the ThermaCool TC was substantially delayed

8  and not issued until February 20, 2009, and the sale and utilization of replacement ThermaTips

9  and of the NXT model of the ThermaCool System has yet to be approved. To the extent that the

10  minimum purchase obligations otherwise applied and could be enforced prior to the SFDA's

11  approval of the sale and utilization of the ThermaCool System, Bel Conor was relieved of the

12  obligation to comply with the minimum purchase obligations because of the delays in the approval

13  the System resulting from Solta's breaches of contract.

14      71. Solta also misstates the minimum purchase obligations that would otherwise have

15  applied if SFDA approval were timely obtained.

16      72. Contrary to Solta's assertions, Section 3E of the Distributor Agreement, which

17  establishes the minimum purchase obligations, merely specifies that:

18              Distributor shall meet the minimum performance
            requirements set forth in Exhibit "A" hereto collectively

19              "Minimum Performance Requirements." The Parties will
            negotiate in good faith during the fourth quarter of the

20              current year, the Minimum Performance Levels for the
            following year.

21

22  (Distributor Agreement, § 3E, Exhibit A hereto.)

23      73. Exhibit A to the Distributor Agreement provides that Bel Conor must order twelve

24  systems, three of which must be purchased for use as Demonstration/Loaner systems, during the

25  first year of the contract, reiterates that the quotas for subsequent years shall be mutually

26  established by the parties and states that Bel Conor must purchase eight ThermaTips per month for

27  each system it sells, beginning four months after installation.

28      74. Bel Conor purchased two demonstration units at the outset, together with two

CASE NO.            -11-           COMPLAINT FOR
PRELIMINARY INJUNCTION

SONNENSCHEIN NATH & ROSENTHAL LLP
525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105
(415) 882-5000

1    additional systems within sixty days after the Distributor Agreement was executed, and purchased
2    a fifth unit in the second contract year. The parties never established minimum purchase
3    requirements for any years beyond the first year of the contract.

4    75. As such, the only specified minimum purchase requirement Bel Conor did not meet
5    was the requirement to purchase twelve systems in the first year of the contract. Solta did not
6    complain about Bel Conor's failure to meet this requirement until over 18 months after
7    performance was required, agreed to the extension with full knowledge that Bel Conor had not
8    purchased twelve ThermaCool Systems in the first year of the contract and continued to perform
9    under the Distributor Agreement. To the extent the requirement to purchase twelve systems could
10   be enforced or was not otherwise held in abeyance, Solta waived this purported default by failing
11   to timely object thereto and provide a notice to cure and agreeing to the extension.

12   76. Bel Conor has not breached the Distributor Agreement by allegedly failing to submit
13   and meet net monthly sales forecasts.

14   77. Section 3B of the Distributor Agreement provides that "Distributor shall provide
15   Thermage with a ninety (90) calendar day rolling non-binding forecast setting forth its estimate
16   requirements for delivery of Consumables and Systems." (Distributor Agreement, § 3B, Exhibit
17   A hereto.) This Section only required Bel Conor to provide forecasts of what purchases it
18   reasonably believed it would make over the next ninety days so that Solta could plan its
19   production.

20   78. As Bel Conor was not purchasing, because it could not legally sell, ThermaCool
21   Systems or ThermaTips, there was nothing for it to forecast and no need to submit monthly
22   forecasts.

23   79. Failing to submit monthly forecasts cannot be deemed a breach of the Distributor
24   Agreement given that they were to be non-binding and mere estimates of what orders would be
25   submitted.

26   80. As Solta failed to complain about the lack of monthly forecasts until nearly three
27   years after the Distributor Agreement was executed, and extended the term of this Agreement, it
28   waived any right to terminate based on the lack of monthly forecasts.

CASE NO.                                   -12-                              COMPLAINT FOR
                                                                      PRELIMINARY INJUNCTION

SONNENSCHEIN NATH & ROSENTHAL LLP
525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105
(415) 882-5000

81. Bel Conor has not breached of the Distributor Agreement or the Extension thereof by allegedly failing to employ an adequate staff.

82. Although Bel Conor could not sell any ThermaCool Systems prior to receiving SFDA approval, it nevertheless maintained, and continues to maintain, a significant staff of engineering, sales, marketing, installation, training and other personnel, in anticipation of receiving approval from the Chinese government to launch the Thermage product line in China.

83. Bel Conor has performed its obligations under the Distributor Agreement, to the extent possible without government approval of Thermage's products, by, among other things, working diligently to market and promote the ThermaCool treatment system in China.

84. It is Solta who has breached the Distributor Agreement, as extended, by, among other things, wrongfully terminating this Agreement.

85. Bel Conor is entitled to specific performance of the Distributor Agreement because it cannot obtain substitute products or a comparable exclusive distribution relationship, monetary damages will not adequately compensate Bel Conor for the losses it has and will sustain as a result of Solta's breaches and wrongful attempt to prematurely terminate the Distributor Agreement, Bel Conor will cease operations if the Distributor Agreement is prematurely terminated and Bel Conor will lose the good will it has developed through its diligent marketing efforts and substantial investment to prime the Chinese market for the introduction of the ThermaCool treatment system.

86. Specific performance of the Distributor Agreement, as extended, would be fair and equitable.

87. As a direct and proximate result of Solta's breach of the Distributorship Agreement by failing to submit applications, refusing to allow Bel Conor to submit applications and refusal to provide Bel Conor necessary documentation to support applications to approve the sale and use of replacement ThermaTips and the NXT model of the ThermaCool System, Bel Conor is only permitted to sell the ThermaCool TC model of the ThermaCool System, and cannot sell the substantially lower priced ThermaCool NXT model in China. To remedy the harm resulting from this breach of contract, Solta should be prohibited from implementing the announced price increase for the ThermaCool TC, and from otherwise changing the existing price of the

CASE NO. -13- COMPLAINT FOR PRELIMINARY INJUNCTION

1 ThermaCool TC.

## SECOND CLAIM FOR RELIEF

## PROMISSORY ESTOPPEL

88. Bel Conor incorporates by reference, as if fully set forth herein, Paragraphs 1 through 87 of this Complaint.

89. In recognition of the fact that Bel Conor would not receive what it promised and would be denied a fair return on the substantial investment it was making to market and promote the ThermaCool System in China, and to induce Bel Conor to assist it with the prosecution of its SFDA applications and promoting the ThermaCool System in China, Solta agreed in writing to extend the term of the Distributor Agreement by eighteen months, to end on March 15, 2011.

90. In reliance upon the foregoing agreement, Bel Conor was induced to spend significant monies, time and effort to continue marketing and promoting the ThermaCool product line to patients and physicians located throughout China, and assisting Solta with the prosecution of its SFDA applications.

91. The promises made by Solta to extend the Distributor Agreement by eighteen months constituted representations that Solta reasonably expected to induce Bel Conor to continue promoting and marketing the ThermaCool product line in China, and assisting Solta with the prosecution of its SFDA applications.

92. At all relevant times, Bel Conor has fully complied, to the extent possible, with its obligations under the Distributor Agreement.

93. By reason of Solta's termination of its exclusive distribution relationship with Bel Conor before the end date of March 15, 2011, an injustice resulted which can only be avoided by enforcement of Solta's promise of the 18-month extension of the Distributor Agreement.

94. By reason of Solta's present refusal to honor Bel Conor's purchase orders, an injustice resulted which can only be avoided by enforcement of Solta's promise of the 18-month extension of the Distributor Agreement.

95. By reason of Solta's announced intention to immediately grant other entities distribution rights in China, an injustice will result which can only be avoided by enforcement of

CASE NO. -14- COMPLAINT FOR PRELIMINARY INJUNCTION

SONNENSCHEIN NATH & ROSENTHAL LLP
525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105
(415) 882-5000

1    Solta's promise of the 18-month extension of the Distributor Agreement.

2        96.  Solta is therefore promissorily estopped from disputing that the Distributorship

3    Agreement was extended until March 15, 2011.

4                          **THIRD CLAIM FOR RELIEF**

5        **BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**

6        97.  Bel Conor incorporates by reference, as if fully set forth herein, Paragraphs 1 through

7    96 of this Complaint.

8        98.  Under California law, which is adopted in the Distributor Agreement, there is implied

9    in every contract a covenant of good faith and fair dealing that neither party will act in a way to

10   compromise the rights of the other to receive the benefits of the contract.

11       99.  While the Distributor Agreement afforded Solta the right to increase the price of the

12   ThermaCool Systems over the term of the contract, Solta abused this right, and unfairly interfered

13   with Bel Conor's right to receive benefits under the Agreement, by raising the price of the

14   ThermaCool TC System to levels that priced Bel Conor out of the market, in an effort to dissuade

15   Bel Conor from continuing as its distributor.

16       100.  As Solta failed to file an application to use the NXT in China, it knows that Bel

17   Conor is legally prohibited from selling the competitively priced NXT model of the ThermaCool

18   System in China, leaving Bel Conor without any products it could sell on a cost competitive basis

19   under the Distribution Agreement.

20       101.  By virtue of its actions, Solta has deprived Bel Conor of the benefit of its bargain

21   under the Distribution Agreement as extended, in violation of the implied covenant of good faith

22   and fair dealing.

23       102.  Solta's breach of the implied covenant of good faith and fair dealing has caused Bel

24   Conor to suffer, and unless Solta is enjoined as requested, will continue to cause Bel Conor to

25   suffer harm for which it may not be adequately compensated in monetary damages, including but

26   not limited to, the cessation of its business, the appropriation of the good will that Bel Conor has

27   developed over many years through its diligent marketing efforts and substantial investment to

28   prime the Chinese market for the introduction of the ThermaCool System, and loss of the

SONNENSCHEIN NATH & ROSENTHAL LLP
525 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94105
(415) 882-5000

1 opportunity to distribute a unique product.

2 103. Bel Conor faces a substantial likelihood of going out of business if Solta is permitted

3 to raise the price of the ThermaCool System to levels that price Bel Conor out of the market.

4 104. The full extent of damages as a result of Solta's conduct would be difficult, if not

5 impossible to calculate because of the intangible nature of the harm.

6 WHEREFORE, plaintiff Bel Conor International, Ltd. demands judgment in its favor and

7 against defendant, Solta Medical, Inc., for an award for the following relief:

8 1. A preliminary injunction sufficient to prevent Solta from granting distribution

9 rights in the Thermage product line in China to anyone other than Bel Conor during the pendency

10 of the Arbitration;

11 2. A preliminary injunction sufficient to prevent Solta from interfering in any way

12 with Bel Conor's exclusive distribution rights in the Thermage product line in China during the

13 pendency of the Arbitration;

14 3. A preliminary injunction enjoining Solta from raising its distributor prices for the

15 ThermaCool TC System above the existing levels provided by the Distributor Agreement for any

16 purchases made by Bel Conor during the pendency of the Arbitration; and

17 4. An award of such other legal and equitable relief as is appropriate.

18

19 Dated: September 17, 2009 Respectfully submitted,

20 SONNENSCHEIN NATH & ROSENTHAL LLP

21

22 By: _____

Michael Barnes

23

24 Attorney for Plaintiff
BEL CONOR INTERNATIONAL, LTD.

27332439

25

26

27

28

CASE NO. -16- COMPLAINT FOR
PRELIMINARY INJUNCTION

# EXHIBIT "A"

 

## INTERNATIONAL DISTRIBUTOR AGREEMENT

This International Distributor Agreement ("Agreement") is entered into as of September 15, 2006 ("Effective Date"), between Thermage, Inc., a Delaware corporation with principal offices at 25881 Industrial Boulevard, Hayward, California 94545, U.S.A. ("Thermage"), and Bei Conor International, Ltd., a company incorporated under the laws of Hong Kong with principal offices at Unit 1602, 16th Floor, Yue Xiu Building, 160-174 Lockhart Road, Wanchai, Hong Kong ("Distributor") (each, a "Party"; together, the "Parties").

In consideration of the mutual promises contained herein, the Parties agree as follows:

### I. DEFINITIONS

A. "Consumables" shall mean the Thermage products sold for use in connection with the System (as defined below) and as further described on Exhibit A.

B. "Correction" shall mean the repair, modification, adjustment, relabeling, destruction, or inspection (including patient monitoring) of a device without its physical removal from its point of use to some other location.

C. "Customer" shall mean, with respect to a Product, any physician that enters into an End User Agreement (as defined below) and will use the Product for his or her treatment of patients and not for distribution in the Territory.

D. "Customer Software" shall mean the software, computer programs, object codes, listings and related materials in machine-readable or printed form (including firmware and all types of media) that are included in or otherwise provided with the System and any Upgrades (as defined below) that may be provided to Customer which Customer Software is subject to the non-exclusive and non-transferable license terms set forth in this Agreement. In no event will Thermage be obligated to provide source code versions of computer programs.

E. "Customer Documentation" shall mean the end user materials typically provided by Thermage to Customers in hard and/or electronic copies in the English language only. Customer Documentation is subject to the non-exclusive and non-transferable license terms set forth in this Agreement.

F. "Distributor Software" shall mean the software, computer programs, object codes, listings, and related materials in machine-readable or printed form (including firmware and all types of media) that are included in or otherwise provided with the System and any Upgrades (as defined below) that may be provided to Distributor which Distributor Software is subject to the non-exclusive and non-transferable license terms set forth in this Agreement. In no event will Thermage be obligated to provide source code versions of computer programs.

G. "Documentation" shall mean Customer Documentation, Marketing Documentation (as defined below), Technical Support Documentation (as defined below), and Training Documentation (as defined below).

H. "End User Agreement" shall mean a Customer agreement which is the form set forth in Exhibit B.

I. "Facility" shall have the meaning set forth in Section 3(G).

J. "First Level Support" shall mean the maintenance and support provided by the Distributor to the Customers. First Support includes, but is not limited to, Customer communication, initial analysis of reported Product problems, implementation of known bug fixes and Upgrades, localization of Customer

Documentation, distribution of Customer Documentation, shipping, returns and providing Loaner Units (as defined below) to Customers.

K.    "Marketing Documentation" shall mean the Product brochures, advertising literature, presentations and other marketing materials and all updates, and revisions that Thermage may provide under this Agreement in hard and/or electronic copies in the English language only.

L.    "Products" shall mean the System, Consumables, Software, Documentation and other hardware, licensed software and consumables listed in Exhibit A. The Products listed on Exhibit A, may be changed, modified, replaced, discontinued or added by Thermage, at Thermage's sole discretion with thirty (30) calendar days notice to Distributor.

M.    "Removal" shall mean the physical removal of a Product from its point of use to some other location for repair, modification, adjustment, relabeling, destruction or inspection.

N.    "Second Level Support" shall mean the maintenance and support provided by Thermage and includes Product repair, replacement and return.

O.    "Software" shall mean Customer Software and Distributor Software. Notwithstanding any thing to the contrary in this Agreement, no title to the Software is transferred under this Agreement; rather all Software is subject to the license terms set forth herein.

P.    "System" shall mean the ThermaCool™ System, which includes the following durable components:  one (1) Cooling Module; one (1) RF Generator; two (2) Handpieces; and one (1) Cart.

Q.    "Technical Bulletin" shall mean any correspondence provided by Thermage to Distributor in the form of a bulletin that: (i) is labeled as for distribution to Customers; and (ii) communicates technical and safety information regarding the Products, such as information regarding procedure techniques, equipment usage and safety considerations.

R.    "Technical Support Documentation" shall mean the technical user manuals and other technical support documentation for the Product and all updates, and revisions that Thermage may provide under this Agreement in hard and/or electronic copies in the English language only, including, without limitation, Technical Bulletins.

S.    "Territory" shall mean the geographic area comprising of the People's Republic of China.

T.    "Thermage Marks" shall mean the product names, trademarks, marks and trade names that Thermage uses to sell its products and services, as listed in Exhibit A.

U.    "Training Documentation" shall mean (i) the training materials regarding use of the Products for use by Distributor's personnel who will market, solicit orders and provide First Level Support for the Products (including, without limitation, all training requirements provided by Thermage to Distributor regarding the safe and proper use of the Products) and (ii) Customer training materials, and all updates, and revisions that Thermage may provide under this Agreement in hard and/or electronic copies in the English language only.

V.    "Title" Notwithstanding anything to the contrary in this Agreement, including references to the "sale" of Products, no title to, or ownership in, the Software is transferred under this Agreement rather all Software is subject to the license terms set forth herein.

2. **APPOINTMENT AND AUTHORITY OF DISTRIBUTOR**

A. Appointment. Subject to the terms and conditions set forth herein, Thermage hereby appoints Distributor as Thermage's distributor for the Products to Customers in the Territory and Distributor hereby accepts such appointment. Subject to the terms and conditions of this Agreement, Distributor's appointment shall be "exclusive" for the Territory meaning that Thermage will not appoint another distributor for the Product for the Territory.

B. Restrictions. Distributor shall not itself, or through any affiliate, agent or other third party, or authorize any third party to: (i) distribute Products to third parties located outside the Territory, (ii) solicit orders for Products from third parties located outside the Territory, (iii) rent, lease or timeshare any Software, or (iv) use the Software, except as set forth herein. Nothing in this Agreement shall be deemed as a restriction on Thermage's right to appoint distributors for: (1) products other than Product in the Territory, or (2) Products outside of the Territory. If Distributor or any Authorized Sub-distributor breaches this Section 2(B), such breach shall be deemed a material breach of this Agreement by Distributor, and Thermage shall have the right to terminate this Agreement upon written notice to Distributor (without any period for cure).

C. Sub-distributors. Subject to the terms and conditions of this Agreement, Distributor may appoint one or more sub-distributors for Products in the Territory (**"Authorized Sub-distributor"**). The Distributor shall inform Thermage of the Authorized Sub-distributor within five (5) calendar days of the appointment of such Authorized Sub-distributor. Distributor shall not provide any Authorized Sub-distributor with any Products, Documentation, End User Agreements or any other materials until such Authorized Sub-distributor enters into a form of written agreement (**"Sub-distributor Agreement"**) with Distributor, binding the Authorized Sub-distributor to terms and conditions substantially similar to those terms and conditions agreed upon by Distributor under this Agreement. Distributor agrees to terminate any Authorized Sub-distributor's Sub-distributor Agreement, promptly upon becoming aware that the Authorized Sub-distributor is selling, promoting or soliciting Products, directly or indirectly, in a manner that is not in accordance with the provisions of this Agreement. The Sub-distributor Agreement shall contain provisions making Thermage a direct and intended third party beneficiary of such Sub-distributor Agreement and Distributor hereby guarantees the performance of the Authorized Sub-distributor with the provisions listed in this Agreement. Distributor shall be solely responsible for, and shall indemnify and hold Thermage free and harmless from, any and all claims, damages or lawsuits (including attorneys' fees) arising out of the acts of the Authorized Sub-distributor.

D. Conflict of Interest. Distributor shall pursue sales policies and procedures to realize the maximum sales potential for the Products in the Territory. Distributor agrees that any efforts by Distributor (directly or through its Sub-distributors) to sell competing products in the Territory would constitute a conflict of interest with respect to Distributor's obligations to market the Products, and Distributor warrants to Thermage that it and its Authorized Sub-distributors do not currently represent or promote any non-ablative skin tightening and any radio frequency based products that compete with the Products. During the terms of this Agreement, Distributor and its Authorized Sub-distributors shall not represent, promote or otherwise try to sell within the Territory any other products that, in Thermage's reasonable judgment, compete with the Products.

E. Reservation of Rights. Except as expressly provided in this Section 2, no right, title, or interest is granted, whether express or implied, by Thermage to Distributor, and nothing in this Agreement shall be deemed to grant to Distributor rights in any products or technology other than the Products, nor shall any provision of this Agreement be deemed to restrict Thermage's right to exploit technology, know-how, patents, or any other intellectual property rights relating to the Products in products other than Products. Thermage reserves the right to appoint other authorized distributors or resellers outside the Territory without restriction.

F. Independent Contractors. The relationship of Thermage on one hand and Distributor, and Authorized Sub-distributors on the other hand, established by this Agreement is that of independent contractors,

and nothing in this Agreement shall be construed to (i) give either Party the power to direct and control the day-to-day activities of the other, (ii) constitute the Parties as partners, joint venturers, co-owners or otherwise as participants in a joint or common undertaking, or (iii) allow either Party to create or assume any obligation on behalf of the other Party for any purpose whatsoever. All financial obligations associated with each Party's business are the sole responsibility of such Party.

## 3.    TERMS OF PURCHASE OF PRODUCTS BY DISTRIBUTOR

A.    Terms and Conditions. All purchases of Products by Distributor directly from Thermage during the term of this Agreement shall be subject to the terms and conditions of this Agreement.

B.    Forecasts. On the first day of each month during the Term (as defined below), Distributor shall provide Thermage with a ninety (90) calendar day rolling non-binding forecast setting forth its estimated requirements for delivery of Consumables and Systems on a monthly basis ("Monthly Forecasts"). Each Monthly Forecast will be submitted to Thermage either by fax or email. Thermage will acknowledge receipt of each Monthly Forecast by providing a confirmational email to Distributor. The Monthly Forecast shall contain content reasonably specified by Thermage, including forecasted monthly demand for Products. Distributor will use commercially reasonable efforts to make each Monthly Forecast as accurate as possible.

C.    Order and Acceptance. All orders for Products submitted by Distributor shall be initiated by written purchase orders sent to Thermage during the term of this Agreement; provided, however, that an order may initially be placed by facsimile or by email if a confirmational written purchase order is received by Thermage after said facsimile or email order. Written purchase orders shall at a minimum include billing and shipping addresses, Product re-order numbers and quantities, delivery requirements and payment information. Thermage shall use its reasonable commercial efforts to notify Distributor of the acceptance or rejection of an order and of the anticipated delivery date for accepted orders within one (1) business week after receipt of the purchase order.

D.    Terms of Purchase Orders. Distributor's purchase orders submitted to Thermage from time to time with respect to Products to be purchased hereunder and Thermage's acceptances thereof shall be governed by the terms of this Agreement, and nothing contained in any such purchase order or acceptance shall in any way modify such terms of purchase or add any additional terms or conditions.

E.    Minimum Performance Levels. Distributor shall use best efforts to maximize Product sales in the Territory. During each year, Distributor shall meet the minimum performance requirements set forth in Exhibit A hereto (collectively, "Minimum Performance Requirements"). The Parties will negotiate in good faith during the fourth quarter of the current year, the Minimum Performance Levels for the following year. If Distributor does not meet the Minimum Performance Requirements for any two quarters during any subsequent calendar year during the Term, Thermage may (i) terminate this Agreement pursuant to Section 9(B), or (ii) appoint additional distributors for the Products in the Territory, in each case, at its sole discretion. It is understood and agreed that, notwithstanding any other provision of this Agreement, Thermage shall be under no obligation to continue the manufacture of any Products.

F.    Product Packaging and Labeling. Unless otherwise instructed by Thermage, Distributor shall deliver the Product to its Customers only as part of an unopened package. Distributor shall not nor allow any third party to repackage Products supplied to Distributor by Thermage hereunder without the prior written consent of Thermage. In addition, except for the addition of information required by applicable laws and regulations or as permitted in this Section 3(F), Distributor shall not re-label Products supplied to Distributor by Thermage hereunder without the prior written consent of Thermage. Thermage shall be responsible for ensuring that all Products are packaged and labeled in accordance with the requirements set forth by the U.S. Food and Drug Administration ("FDA"). Distributor shall be responsible for ensuring that all Products are packaged and labeled in accordance with the applicable requirements in the Territory. Distributor shall not remove, alter, cover or obfuscate

any logo, trademark notice or other proprietary rights notices or labels placed or embedded by Thermage on or in any package of any of the items contained herein, without Thermage's prior written consent.

G. **Shipping.** All Products delivered pursuant to the terms of this Agreement shall be suitably packed for air freight shipment in Thermage's standard shipping cartons, marked for shipment to an address located in the United States as may be specified by the Distributor for a particular order Ex Works (Incoterms 2000) Thermage's facility, currently located at the address listed for Thermage at the beginning of this Agreement ("Facility"), at which time title to such Products (excluding Software) and risk of loss shall pass to Distributor. Unless otherwise instructed in writing by Distributor, Thermage shall select the carrier. Thermage shall use reasonable efforts to deliver the Products on the date agreed to between Distributor and Thermage. Shipping and delivery dates are approximate and are based upon prompt receipt of all necessary payment and information. Thermage will not be liable for failure to ship products in connection with governmental order, strikes, floods, fires, earthquakes, acts of war or terrorism, or other causes reasonably beyond Thermage's control, including inability to obtain labor or other materials or other product delays, in which case Thermage may postpone delivery or shipment at its option without liability. All freight, insurance, and other shipping expenses, export fees and costs, as well as any special packing expense, shall be paid by Distributor.

H. **Return of Defective Products.** Distributor shall inspect all Products within one (1) business week following receipt thereof and may reject any Product that fails in any material way to meet the applicable specifications for that Product. Thermage's sole and exclusive liability and Distributor's exclusive remedy shall be, at Thermage's sole election, to repair or replace the Product or credit Distributor's account for the net amount actually paid for any such Product, provided that (i) Distributor promptly notifies Thermage in writing that such Product failed to conform and furnishes a detailed explanation of any alleged nonconformity and requests a return material authorization number, (ii) such Product is returned to Thermage by Distributor D.D.P. (Incoterms 2000) Thermage's Facility or such other location as Thermage may designate, within thirty (30) calendar days from the invoice date with the return material authorization number ("RMA Number") affixed prominently to the outside packaging, and (iii) Thermage is satisfied that claimed nonconformities actually exist and were not caused by accident, misuse, neglect, alteration, unusual physical or electrical stress, improper installation, repair or improper testing. No credit will be given for returns made by Distributor after thirty (30) calendar days from the invoice date. If any Product is returned by Distributor in accordance with the foregoing provisions of this Section 3(H) (including, without limitation, subsection (iii) above), Thermage will reimburse Distributor for reasonable shipping charges incurred by Distributor in returning such Product to Thermage in accordance with this Section 3(H). Notwithstanding the above, Thermage will not accept any returns for sterile Consumables if the original packaging has been opened or tampered with without Thermage's prior written approval.

### 4. PRICING AND PAYMENT

A. **Prices.** All prices are Ex Works (Incoterms 2000) Thermage's Facility. The purchase price to Distributor for each of the Products ("Purchase Price") shall be as set forth in Exhibit A attached hereto. Thermage shall have the right to modify the prices in Exhibit A at its sole discretion, upon thirty (30) calendar days' written notice to the Distributor prior to the effective date of the price change. Price increases shall not affect unfulfilled purchase orders accepted by Thermage prior to the effective date of the price increase. Custom instrument orders of non-standard system configurations will be priced individually, depending upon customer requirements and system components.

B. **Taxes, Duties, Tariffs and License Fees.** The Purchase Price does not include any taxes (including any excise, sales, use, value added, withholding, and similar taxes), customs duties, tariffs or license fees, and payments to Thermage are payable in full without reduction for any such taxes, duties, tariffs or fees. Distributor shall be responsible for and shall indemnify Thermage for any appropriate taxes, customs duties, tariffs and license fees actually paid by Thermage, based on payments to Thermage hereunder or on the use or possession by Distributor and any customers of Products or support or repair services, but excluding United States federal, state and local taxes based on Thermage's net income.

C.      Payment. Payment of the Purchase Price for the Products shall be made by Distributor to Thermage following acceptance pursuant to an electronic wire transfer of funds within thirty (30) days of shipment of the Product. Payment shall be in U.S. dollars. All exchange, banking, and other charges shall be at Distributor's expense. This Section 4(C) shall in no way limit any other remedies available to Thermage. Distributor shall pay all of Thermage's costs and expenses (including reasonable attorneys' fees) to enforce and preserve Thermage's rights under this Section 4(C).

## 5.      TRAINING, INSTALLATION, AND SUPPORT

A.      Services by Distributor. Distributor shall have the sole responsibility and liability for (i) installing the Products, (ii) training the Customers with respect to the Products sold in the Territory and (iii) providing First Level Support to Customers. Distributor shall perform all training with respect to the Products in accordance with the Training Documentation including, without limitation, any guidelines and syllabuses contained therein. Except as expressly permitted by this Agreement, Distributor shall not use any modifications of such Training Documentation or any substitutions therefor. Without limiting the foregoing obligations, all training content and programs shall be subject to the prior written approval of Thermage. Distributor shall create and maintain a record of training for each individual trained by Distributor with respect to the Products, substantially in the form attached hereto as Exhibit D (each such record, a "Physician Training Record"). Distributor shall provide promptly to Thermage's International Department a copy of each Physician Training Record. For all Second Level Support, Distributor shall provide Thermage within fifteen (14) calendar days of the initial Customer problem report, written notification if Second Level Support is required from Thermage. Distributor shall at all times ensure that its employees and agents are fully trained, with respect to the Products and its uses, and that Distributor and its employees and agents are and remain in full compliances with all applicable federal, state and local laws and statutes. Distributor also agrees to maintain an inventory of relevant spare parts and Consumables that may be required to support Customers. In addition, Distributor shall be responsible for providing Customers any Loaner Unit (as defined below) and initiating returns of Products under the terms of this Agreement. Distributor shall purchase loaner units from Thermage solely to support Customers in the event of a warranty or service problem ("Loaner Unit"). Distributor has sole responsibility and liability for Loaner Units provided to Customers. Distributor's responsibility for Loaner Units shall not exceed the requirement to secure one (1) Loaner Unit for every twenty (20) systems installed. Thermage shall have no obligation to provide a Loaner Unit to any Customer.

B.      Services by Thermage. Thermage or another third party designated by Thermage shall provide Product installation. Customer use and sales training to Distributor's personnel as determined by both Parties in good faith, at Distributor's facility or at mutually agreed upon locations (e.g., Customer's clinic). Thermage and Distributor shall each pay their own costs for travel, food, and lodging during the training period. Distributor agrees to pay the costs of professional language interpretation services during these training programs if the services are deemed by Thermage, in its sole discretion, to be necessary. In addition to sales and installation training, Thermage shall promptly provide Distributor with reasonable copies of the Documentation, in hard and/or electronic form, at no charge. Thermage shall cooperate with Distributor in establishing efficient service procedures and policies for the Products. Thermage shall provide a reasonable level of telephonic marketing and technical support ("Telephone Support") to employees of Distributor who have been trained by Thermage during its normal business hours to answer Distributor's questions related to Products. All Telephone Support will be provided in English only. Upon Distributor's completion of First Level Support obligations and upon Distributor's oral request, Thermage shall provide Second Level Support to Distributor. At Thermage's sole discretion, Thermage may provide Second Level Support directly to Customers. All Second Level Support will be provided in English only.

## 6.      MARKETING

A.      Marketing Plans. The Parties shall mutually agree upon a detailed marketing plan for the Territory, such plans to include plans related to the prelaunch, launch, promotion and sale of Product(s). Subject to

Distributor Agreement-Indv-coverlanguage-mksl.ak1-Date-FINAL-000706        Page 6 of 18                      Initial

[signature/initial mark]

 

the provisions of this Agreement, and subject to compliance with any agreed upon marketing plans, Distributor shall have full responsibility for the day-to-day commercialization and marketing of the Product(s).

    B.    Marketing Efforts. Neither Party shall use false or misleading advertising practices, and in no event shall Distributor make any representations regarding the Products different than or in excess of those in the information provided by Thermage in writing, or that it knows, or has reason to believe are misleading.

    C.    Use of the Documentation. All use, restrictions and localization of the Documentation by Distributor shall be subject to the provisions of Section 7 of this Agreement. Additionally, if required by any governmental and/or regulatory provisions of the Territory, Distributor shall, at its own expense, provide the applicable regulatory authorities sufficient quantities of the Documentation to meet governmental and/or regulatory requirements. Furthermore, it is understood that any claim, message or other material part of the Documentation, which has not previously been approved or used by Thermage in its own promotional or training activities, shall be subject to review and approval by Thermage prior to the use.

    D.    Costs and Expenses. Except as otherwise expressly provided herein, each Party shall solely bear all costs and expenses of performing its obligations hereunder. Except as provided for under this Agreement, neither Party shall be liable for any costs or expenses incurred without its prior written authorization.

## 7.    SOFTWARE AND DOCUMENTATION LICENSE

    A.    License. Subject to the terms and conditions of this Agreement, Thermage grants to Distributor a personal, non-exclusive, non-transferable, license:

    (i)    To use the Software internally for the purpose of marketing and demonstrating Products to potential customers in the Territory, and providing First Level Support and training to Customers and Authorized Sub-distributors;

    (ii)    To sublicense and distribute the Customer Software and Customer Documentation to Customers in the Territory solely in connection with the authorized distribution of Products in the Territory subject to the terms of the End User License Agreement.

    (iii)    To internally use the Technical Support Documentation and Training Documentation as necessary for providing First Level Support and training of the Products to Customers in the Territory;

    (iv)    To sublicense and distribute the Distributor Software, Training Documentation and Technical Support Documentation solely to Sub-distributors (which Sub-distributors shall have no further right to sublicense) under an agreement which complies with Section 2 of this Agreement, and which limits the use of such Distributor Software and Training Documentation to the training and First Level Support of Customers in the Territory;

    (v)    To use, reproduce, display and distribute Marketing Documentation for the purpose of marketing or demonstrating the Products to potential customers in the Territory;

    (vi)    To use, reproduce, distribute the End User Agreement to Customers in the Territory;

    (vii)    To use the Demonstration Loaner Systems internally for the purpose of marketing and demonstrating Products to potential customers in the Territory; and

 

(viii)    To translate the Documentation and End User Agreement in accordance with Section 7(F) below.

B.    License Restrictions. Distributor shall not and shall not authorize any third party to: (i) create derivative works, as defined under U.S. 17 USC §106 (as interpreted by applicable case law), copy, alter or in any way modify the Software without the prior written consent of Thermage, (ii) translate, decompile, disassemble, reverse compile, reverse engineer, interrogate, or decode the Software or in any other manner reduce the Software to human perceivable form except to the extent that such restrictions are not permitted under applicable law, (iii) bypass or delete any copy protection methods that are for preventing unauthorized copying or use of the Software and Documentation, or (iv) electronically distribute, timeshare, market by interactive cable or by remote processing services the Software and Documentation. Except as expressly authorized under this Agreement, Distributor shall not and shall not authorize any third party to copy, use or disclose the Software or its functions and the Documentation (i) on behalf of or in relation to any third party products, devices or services, or (ii) on behalf of or to any third parties. Distributor acknowledges that the licenses granted pursuant to this Agreement do not provide Distributor with any title or ownership rights in or to the Software and Documentation, but only a right of limited use. Distributor shall obtain all copies of the Software and Documentation only from Thermage. ALL RIGHTS NOT EXPRESSLY GRANTED HEREUNDER ARE RESERVED TO THERMAGE OR ITS SUPPLIERS.

C.    Proprietary Rights and Notices. Distributor shall not remove, alter, cover or obfuscate any proprietary rights notices such as patent, copyright, mask work, trademark or confidentiality notices on or in any Software, Documentation or copies thereof.

D.    End User Agreements. Software provided to Distributor hereunder is subject to license and not sale. Prior to the shipment of any Product to any Customer or the initial use of any Product by any Customer, whichever is earlier, Distributor shall ensure that such Customer has been bound in writing to the terms and conditions of the End User Agreement governing such Product. Upon request of Thermage, Distributor shall provide to Thermage copies of all executed End User Agreements relating to any Product distributed under this Agreement

E.    Upgrades. At Thermage's sole discretion, and without charge, Thermage may supply minor Software enhancements and feature upgrades compatible with the Product purchased by the Customer ("Upgrades"). As between Thermage and Distributor, Distributor shall be solely responsible and liable for distributing Upgrades to Customers and supporting Customer installation thereof, unless Thermage provides written notice to Distributor that Thermage wishes to directly support Customer Upgrades, in which case Distributor shall provide Thermage with all assistance reasonably requested by Thermage. Distributor shall create and maintain a record of each Software Upgrade performed by Distributor or one of Distributor's Authorized Sub-distributors, substantially in the form attached hereto as Exhibit I; (each such record, a "Software Upgrade Record"). Each Software Upgrade Record shall include and be maintained by Distributor pursuant to the (i) Customer's name; (ii) location of the Product; (iii) Product device serial number; and (iv) date of installation of the Upgrade. Distributor shall provide promptly to Thermage's Customer Service Department a copy of each Software Upgrade Record.

F.    Translation of Documentation and End User Agreements. Distributor shall be primarily responsible for translations of all Documentation and the Parties shall agree in writing (i) if the Documentation, End User Agreements and other materials will be localized (collectively "Localized Materials"), and (ii) on the languages for translation. All localization shall be done at Distributor's expense, unless agreed otherwise by the parties in writing. Thermage shall own all right, title, and interest in and to the localization of the Localized Materials including, without limitation, all intellectual property rights therein and thereto, regardless of which Party performs such localization. Distributor hereby irrevocably transfers, conveys and assigns to Thermage in perpetuity all right, title, and interest in such localization of the Localized Materials including, without limitation, all intellectual property rights therein and thereto. Thermage shall have the exclusive right to apply for or register copyrights and such other proprietary protections for the Localized Materials as it wishes. Distributor agrees to

Distributor Agreement [left-reader-out] and out of a Line (LXAL) 2008 Co.    Page 25 of 55

execute such documents, render such assistance, and take such other action as Thermage may reasonably request, at Thermage's written request and expense, to apply for, register, perfect, confirm, maintain and protect Thermage's rights in the localization of the Localized Materials. Without limiting the foregoing, Thermage shall have the exclusive right to commercialize, prepare and sell products based upon, sublicense, prepare derivative works from, or otherwise use or exploit the localization of the Localized Materials. Distributor hereby waives any and all moral rights, including any right to identification of authorship or limitation on subsequent modification that Distributor (or its employees, agents or consultants) has or may have in any localization of the Localized Materials. Prior to any distribution of any Localized Materials to any third party. Distributor shall obtain Thermage's prior written approval of such Localized Materials, and Thermage shall have the right to confirm the accuracy of all Localized Materials at Distributor's expense.

8.    **ADDITIONAL OBLIGATIONS OF DISTRIBUTOR**

A.    **Personnel.** Distributor shall devote sufficient, qualified and suitably trained sales, marketing, installation and training personnel (as determined by Thermage) to the Products to fulfill its responsibilities under this Agreement.

B.    **Demonstration/Loaner Systems.** Distributor shall purchase from Thermage demonstration/loaner equipment described in **Exhibit A** (Terms) ("**Demonstration/Loaner Systems**") within sixty (60) calendar days of the signing of this Agreement and prior to scheduled Distributor/Customer training. Distributor shall secure sufficient Demonstration/Loaner Systems to effectively support Customers in the Territory. Demonstration/Loaner Systems are used solely to market and solicit, and provide service support for the Product to potential Customers in the Territory. Distributor agrees to purchase the quantity of the Demonstration/Loaner Systems as set forth in Exhibit A (Terms) and agrees to maintain such levels of Demonstration/Loaner Systems throughout the term of the Agreement. All use of the Demonstration/Loaner Systems are subject to the terms and conditions of this Agreement.

C.    **End User Agreements.** Distributor shall promptly notify Thermage of any violations of any End User Agreement of which Distributor is aware including, without limitation, any movement of any System to any country other than the country to which such System was initially shipped for delivery to the applicable Customer. Distributor shall promptly notify Thermage in writing of any sale, donation or other transfer of Products by a Customer to a third party. Distributor shall diligently assist Thermage in the enforcement of the End User Agreements and shall use its best efforts to ensure that Customers abide by the terms of the End User License Agreements.

D.    **Sales Data.** Upon Thermage's request, Distributor shall provide Thermage with all sales data relating to Products purchased under this Agreement during any time period designated by Thermage including, without limitation: i) the name of each Customer that purchased Products during such time period; (ii) the address and other contact information for such Customer; (iii) the type and quantity of Products purchased by such Customer during such time period; and (iv) the date of any such purchase.

E.    **Government Clearance.** Distributor, at its own cost, shall be responsible for obtaining all government approvals, permits, registrations, licenses, exemptions, exceptions and other permissions or clearances necessary and useful to the lawful distribution and use of the Products in the Territory ("Permits"). Thermage will provide, at its cost, reasonable assistance and information to assist Distributor in obtaining such Permits. To the fullest extent allowed under applicable law, such Permits shall be obtained in the name of Thermage alone. Distributor shall keep Thermage informed with respect to such Permit acquisitions and will confer with Thermage as to all such Permits which Distributor may apply for under the terms of this Agreement.  In the event of termination and/or expiration of this Agreement, and/or Distributor's status change from an exclusive distributor to a non-exclusive distributor, Distributor agrees to execute such documents, render such assistance, and take such other action as Thermage may reasonably request, at Thermage's expense, to apply for, register, perfect, confirm, and

protect Thermage's rights in the Permits including (without limitation) an assignment of all such Permit applications or Permits to Thermage or such other third party as Thermage may designate in writing.

F.        Import and Export Requirements.  Distributor shall, at its own expense, pay all import and export licenses and permits, pay customs charges and duty fees, and take all other actions required to accomplish the export and import of the Products purchased by Distributor. Distributor understands that Products may be subject to regulation by agencies of the U.S. government, including the U.S. Department of Commerce, which may affect Thermage's ability to perform under the terms of this Agreement.

G.        Health and Safety Laws and Regulations.  Distributor shall comply fully with any and all applicable health and safety laws and regulations of the Territory as they relate to the Products and their uses.  In addition, Distributor shall monitor the appropriate information sources closely for changes in such laws and regulations, and other requirements in the Territory relating to the distribution of Products in the Territory, and notify Thermage promptly in writing of any and all such changes.

H.        Medical Device Reporting.  Pursuant to governmental medical device reporting regulations (e.g., the FDA's Medical Device Reporting (MDR) Regulations and any other applicable medical device reporting regulations, such as "Vigilance Reporting" and Canada Mandatory Problem Reporting (MPR)), Thermage is required to report to the applicable agency information that reasonably suggests that a Product may have caused or contributed to the death or serious injury or has malfunctioned and that the device would be likely to cause or contribute to a death or serious injury if the malfunction were to recur.  Thermage and Distributor agree to supply to the other any such information promptly after becoming aware of it so that Thermage and Distributor can comply with governmental reporting requirements. It is understood and agreed that reporting to Thermage shall be within twenty-four (24) hours to enable Thermage to comply with FDA reporting requirements.  Distributor shall make available to Thermage for inspection Distributor's processes and records for adverse event and other regulatory reporting purposes upon reasonable notice from Thermage, and further Distributor shall ensure that Distributor's processes and records comply with all applicable laws and regulations in the Territory.

I.        Product Recalls, Removals and Corrections.  In the event that Thermage is required by any regulatory agency to perform a Product recall, Removal or Correction, or if Thermage or a regulatory authority initiates a Product recall, Removal or Correction, Distributor shall cooperate with and assist Thermage in locating, and retrieving if necessary, Products from Distributor's Customers.  Distributor shall provide Thermage with timely and accurate information including location, quantity of Product by serial number and lot number as reasonably requested by Thermage.  Product recalls, Removals and Corrections initiated by Thermage or by the FDA shall be at Thermage's cost and expense, with Thermage's liability in no event exceeding the cost of return of such Products to Thermage and replacement value of such Product.  Except as described in the preceding sentence, Distributor shall be responsible for all of the costs and expenses of Product recalls, Removals and Corrections initiated by a regulatory authority within the Territory.  Distributor shall maintain records of sales of Products by lot number and by Customer to whom such Product was sold or otherwise transferred.  Upon Thermage's request, Distributor shall provide Thermage with access to such records in the event of a Product recall, Removal, Correction or other quality related issue.  Distributor shall be responsible for obtaining all records of its sales to Customers in the event of a Product recall, Removal, Correction or other quality related issue.

J.        Product Complaints.  During the time that the Products are commercially marketed, distributed, or sold by Distributor, Distributor shall promptly investigate and monitor all Customers and/or regulatory complaints and/or correspondence concerning the use of the Products in the Territory.  Distributor shall advise Thermage of all complaints relating to the Products as promptly as possible but not more than seven (7) calendar day following the date Distributor receives such complaint.  In addition, within ten (10) calendar days following the date Distributor receives such complaint, Distributor shall also provide Thermage with a written report, substantially in the form attached hereto as Exhibit C ("Incident Information Gathering Form") relating thereto.  Any notice to Thermage under this Section 8(J) shall be sent via facsimile and overnight delivery service to the attention of Thermage's Customer Service Department or to such other address or person as Thermage may

designate by notice. If Distributor fails to submit timely any report pursuant to this Section 8(J), Thermage may withhold Product shipments under this Agreement until the reporting is received by Thermage.

K.     Expense of Doing Business. Any and all obligations associated with Distributor's business shall remain the sole responsibility of Distributor. Any and all sales and other agreements between Distributor and Customers are and shall be Distributor's exclusive responsibility and shall have no affect on Distributor's obligations pursuant to this Agreement. Distributor shall bear the entire cost and expense of conducting its business in accordance with the terms of this Agreement.

L.     Notice of Change. Distributor shall promptly advise Thermage of (i) any changes in Distributor's status, organization, personnel, and similar matters, (ii) any changes in the key personnel, organization, and status of any major Customers of Thermage in the Territory, (iii) any changes in the key personnel, organization in the Territory, and (iv) any political, financial, legislative, industrial or other events in the Territory that could affect the mutual business interests of Distributor and Thermage, whether harmful or beneficial

M.     Standard of Business Practices. Distributor shall establish and maintain, and shall cause its employees, consultants, and agents to establish and maintain a high standard of ethical business practices in connection with its distribution of Products in the Territory.

N.     Notification of Unauthorized Use. Distributor shall promptly notify Thermage in writing upon its discovery of any unauthorized use or infringement of the Products, Software or Thermage's patent, copyright, trademark or other intellectual property rights with respect thereto. Thermage shall have the sole and exclusive right to bring an infringement action or proceeding against a third party, and, in the event that Thermage brings such an action or proceeding, Distributor shall cooperate and provide full information and assistance to Thermage and its counsel in connection with any such action or proceeding; provided that Thermage shall reimburse Distributor for any expenses (including but not limited to reasonable attorney's fees) incurred by Distributor.

O.     Audits. Thermage shall have the right to periodically conduct audits of Distributor's records, practices and procedures related to compliance with the terms and conditions of this Agreement. Thermage shall provide Distributor a minimum of forty-eight (48) hours advance notice of any such audit. Such audits may be performed at Distributor's facilities or, at Thermage's sole discretion, may be performed through an exchange of documentation.

P.     Distribution of Technical Bulletins. From time-to-time, Thermage may deem it appropriate to distribute Technical Bulletins to Customers using Thermage Products. As directed by Thermage, Distributor shall distribute such Technical Bulletins to all Customers of Distributor (whether such Customer is a Customer as of the date of the applicable Bulletin or becomes a Customer at anytime after such date). Distributor shall establish and maintain practices and procedures that ensure timely and effective distribution of Technical Bulletins to such Customers. Distributor shall establish and maintain distribution records and shall conduct checks to verify the effective distribution and receipt by such Customers of all Technical Bulletins. Distributor shall provide such records to Thermage upon request by Thermage.

## 9.    TERM AND TERMINATION

A.     Term. This Agreement shall continue in force for a fixed term of three (3) years from the date hereof ("Term") unless terminated earlier under the provisions of this Agreement. At the end of the Term, this Agreement shall terminate automatically without notice unless prior to that time the term of the Agreement is extended by mutual written consent of the Parties.

B.     Termination for Cause. If either Party breaches any provision of this Agreement, then the non-breaching Party may give written notice to the breaching Party that if such breach is not cured within thirty

 

(30) calendar days after such breaching Party's receipt of such notice the Agreement will be terminated. If the non-breaching Party gives such notice and such breach is not cured during such thirty (30) calendar day period, then the Agreement shall automatically terminate at the end of that period.

C.  Termination for Insolvency. Either Party may terminate this Agreement by delivering written notice to the other Party upon the occurrence of any of the following events: (i) a receiver is appointed for either Party or its property, (ii) either Party commences, or has commenced against it, proceedings under any bankruptcy, insolvency or debtor's relief law, which proceedings are not dismissed within sixty (60) calendar days, or (iii) either Party is liquidated or dissolved.

D.  Effect of Termination.

(i)  Inventory. Within ten (10) calendar days after the effective date of termination of this Agreement, Distributor shall use reasonable efforts to provide Thermage with a complete inventory of Products in Distributor's possession, in transit to Distributor from Thermage or otherwise in Distributor's Control. Thermage shall have the right, but not the obligation to buy back the inventory at the original invoiced pricing and to repurchase Loaner Units at the then-market value of similar used Products.

(ii)  Return of Materials. On or before ten (10) calendar days after the termination of this Agreement, each Party shall deliver to the other Party all Confidential Information (as defined below) of the other Party, but that each Party shall be entitled to retain Confidential Information as reasonably required, and for the limited time period necessary, to exercise its surviving rights under Section 9(F) above (if any); provided however, that such Confidential Information shall be returned immediately thereafter. All Thermage Marks, Documentation, Marketing Materials, patents, copyrights, designs, drawings, formulas or other data, photographs, samples, literature, and sales and promotional aids of every kind related to the Products or provided by Thermage shall remain the property of Thermage. Within thirty (30) calendar days after the effective date of termination or expiration of this Agreement, Distributor shall destroy all tangible items bearing, containing, or contained in, any of the foregoing, in its possession or control and provide written certification of such destruction, or prepare such tangible items for shipment to Thermage, as Thermage may direct, at Thermage's expense. Distributor shall not make or retain any copies of any confidential items or information, which may have been entrusted to it. Effective upon the termination of this Agreement, Distributor shall cease to use all trademarks and trade names of Thermage. During the term of this Agreement and after any termination or expiration of this Agreement, Thermage shall have the right to continue to use and disclose for any purpose Customer lists, Customer data and other Customer information and any other data relating to the Products and provided by Distributor to Thermage during the term of this Agreement.

(iii)  Transition. Upon termination of this Agreement, Distributor shall diligently cooperate with Thermage to effect a smooth and orderly transition in the sale of the Products in the Territory and support of existing Customers. Within thirty (30) calendar days of termination or expiration of this Agreement, Distributor shall deliver to Thermage (i) copies of all sales records and call reports for the previous one (1) year, (ii) a report identifying all outstanding leads for sales of Products and describing the status of any other sales activities regarding the Products, and (iii) a list of all existing Customers of the Products, including contact information and End User Agreements. From the time that a notice of termination is received by either Party until the effective termination date, Distributor shall refer all Product inquiries to Thermage, shall support Distributor's existing Customers in the Territory (but shall have no right to sell additional Products) and shall cooperate fully with any newly-appointed distributors. After the expiration or termination of this Agreement, Distributor shall continue to provide First Level Support to its Customers, until Thermage provides notice to Distributor that Thermage (or its designee) wishes to assume First Level Support of such Customers. Thermage, at its sole discretion, may provide Second Level Support on a time and materials basis. Distributor shall provide cooperation, information and assistance to Thermage in Thermage's efforts to provide support to Distributor's Customers of the Products existing as of the effective date of any termination or expiration of this Agreement.

 

(iv)   Limitation on Liability.   In the event of termination by either Party in accordance with any of the provisions of this Agreement, neither Party shall be liable to the other, because of such termination, for compensation, reimbursement or damages on account of the loss of prospective profits or anticipated sales or on account of expenditures, inventory, investments, leases or commitments in connection with the business or goodwill of Thermage or Distributor. Termination shall not, however, relieve either Party of obligations incurred prior to the termination.

L.   Survival of Certain Terms.   The provisions of Sections 1, 2, 5, 7(A)(iii), 7(B), 7(C), 7(E), 8, 9, 10, 11, 12, 13, 14 and 15 shall survive the termination of this Agreement for any reason. All other rights, licenses and obligations of the Parties shall cease upon termination of this Agreement; provided however, the terms of the End User Agreements shall survive in accordance with their own terms. Notwithstanding the above, the license granted to Distributor in Section 7(A)(iii) of this Agreement, shall continue solely to permit Distributor to fulfill their First Level Support Obligations as set forth in Section 9(D)(iii).

## 10.   PROPERTY RIGHTS

A.   Property Rights.   Distributor acknowledges and agrees that, as between Thermage and Distributor, Thermage owns all right, title, and interest in the product lines that include the Products (and Software) and in all of Thermage's patents, trademarks, trade names, inventions, copyrights, know-how, and trade secrets relating to the design, manufacture, operation or service of the Products. The use by Distributor of any of these property rights is authorized only for the purposes herein set forth, and upon termination of this Agreement for any reason such authorization shall cease. In the event that Distributor makes any improvements or modifications to the Products (and Software), whether or not patentable, Thermage shall retain all right, title and interest in such improvements or modifications and any patent applications or patents derived therefrom.

B.   Rights to Manufacture.   The Products are offered for sale and are sold by Thermage subject in every case to the condition that such sale does not convey any license, expressly or by implication, to manufacture, duplicate or otherwise copy or reproduce any of the Products or their component hardware and Software.

## 11.   CONFIDENTIALITY

A.   Definition.   "Confidential Information" means any and all proprietary and trade secret information, which is not otherwise in the public domain and of which the owner actively undertakes to restrict or control the disclosure to third parties in a manner reasonably intended to maintain its confidentiality, and which the disclosing Party ("Disclosing Party") disclosed to the receiving Party ("Receiving Party"). Confidential Information shall include information that, (i) is disclosed orally (whether or not designated as "confidential"), or may be learned by inspection of computer programming code, equipment or facilities, and (ii) if disclosed in writing shall be marked as "confidential" or with some other similar marking. Notwithstanding any designation of confidentiality, (i) the Thermage technology shall be deemed the Confidential Information of Thermage and (ii) any information or materials, which constitute "Confidential Information" under, and were exchanged pursuant to, a non-disclosure agreement between the Parties, shall be deemed Confidential Information under this Agreement.

B.   Exclusions.   Notwithstanding the foregoing provisions of this Section 11, Confidential Information shall not include information that: (i) was in the Receiving Party's possession before receipt from the Disclosing Party and obtained from a source other than the Disclosing Party and other than through the prior relationship of the Disclosing Party and the Receiving Party, (ii) is or becomes a matter of public knowledge through no fault of the Receiving Party, (iii) is rightfully received by the Receiving Party from a third party without a duty of confidentiality, (iv) is independently developed by the Receiving Party without reference to the Confidential Information of the Disclosing Party, or (v) is disclosed by the Receiving Party with the Disclosing Party's prior written approval

 

C. **Non-Use and Non-Disclosure Obligations.** The Receiving Party shall: (i) protect the Confidential Information of the Disclosing Party by using the same degree of care, but no less than a reasonable degree of care, to prevent the unauthorized use, dissemination, or publication of the Confidential Information that the Receiving Party uses to protect its own confidential information of a like nature, (ii) not use any Confidential Information of the Disclosing Party except as necessary or expressly permitted under this Agreement, (iii) not use any Confidential Information of the Disclosing Party in violation of any use restriction in any other written agreement entered into between the Parties, and (iv) not disclose any Confidential Information of the Disclosing Party to any third party.

D. **Compelled Disclosure.** If the Receiving Party believes that it may be compelled by a court or other authority to disclose Confidential Information of the Disclosing Party, it shall: (i) give the Disclosing Party prompt written notice so that the Disclosing Party may take steps to oppose such disclosure, and (ii) cooperate with the Disclosing Party in its attempts to oppose such disclosure. If the Receiving Party complies with the above, it shall not be prohibited from complying with such requirement to disclose, but shall take all reasonable steps to make such disclosure subject to a suitable protective order or otherwise prevent unrestricted or public disclosure.

E. **Confidentiality of Agreement.** Each Party agrees to treat as Confidential Information the terms and conditions of this Agreement, and each Party agrees that it will not disclose such terms or conditions to any third party without the prior written consent of the other Party; provided, however, that each Party may disclose such terms and conditions of such agreements: (i) as required by any court, governmental body, or as otherwise required by law, (ii) in confidence, to legal counsel of the Parties, accountants, and other professional advisors, (iii) in confidence to banks, investors and other financing sources and their advisors, (iv) in connection with the enforcement of, or rights under, this Agreement, or (v) in confidence, in connection with an actual or prospective merger, acquisition, change of control, sale of a Party's entire business or a portion of a Party's business, or similar transaction. Notwithstanding the above and as mutually agreed upon, the Parties may jointly issue a press release regarding this Agreement.

F. **Injunctive Relief.** The Parties acknowledge that (i) the restrictions and obligations contained in this Section 11 are reasonable and necessary to protect each Party's legitimate interests, (ii) in the event of a violation of these restrictions, remedies at law may be inadequate and such violation are likely to cause irreparable damage to the Disclosing Party within a short period of time, and (iii) the Disclosing Party will be entitled to injunctive relief against each and every violation without the necessity of posting a bond.

12. **TRADEMARKS AND TRADE NAMES**

A. Subject to the terms and conditions of this Agreement, Thermage hereby grants to Distributor a non-exclusive, non-transferable, worldwide, fully paid-up, royalty-free license to use the Thermage Marks solely in connection with its obligations under this Agreement and solely in a manner that is commensurate with the style, appearance and quality of the Thermage services bearing such marks and in the style reasonably instructed by Thermage from time to time. In no event shall Distributor be permitted to sell or sublicense the Thermage Marks. Distributor shall use the Thermage Marks only in accordance with generally acceptable proper trademark-usage standards, including properly marking the Thermage Marks with the appropriate trademark symbols as notified by Thermage from time to time. Distributor shall not alter or modify any of the Thermage Marks without the express written permission of Thermage.

B. Distributor agrees to submit to Thermage sample materials using any Thermage Marks before release to the public for inspection for Thermage's approval, which approval shall not be unreasonably withheld. Within five (5) business days following its receipt of a proposed use, Thermage shall notify Distributor in writing whether the proposed use is approved. Such proposed use shall be deemed approved if Thermage fails to notify Distributor of any disapproval within five (5) business days after receipt of such proposed use from Distributor. Once such proposed use of an Thermage Mark has been approved by Thermage as provided in this section, Distributor shall have no obligation to resubmit the same proposed use prior to each subsequent use.

 

provided the use of such material remains consistent with the initial approval by Thermage as set forth herein and provided further that the foregoing shall not limit Distributor's obligation to use any Thermage Mark consistent with the generally acceptable proper trademark-usage standards.

C.      Distributor's use of the Thermage Marks shall not create in the Distributor any right, title or interest thereto and all such use and good will attributed thereto shall inure to the exclusive benefit of Thermage. Nothing in this Agreement shall be construed as granting or transferring to the Distributor any right, title or interest in and to any Thermage Marks, except the right to use the same during the term of this Agreement, as provided in this Agreement. Distributor shall not register the Thermage Mark, or any similar trademark.

D.      Distributor shall (i) execute any and all documents reasonably required to record Distributor as a registered user of Thermage Marks in the Territory, at Distributor's expense, (ii) cooperate as requested by Thermage in providing information, specimens and documentation that may be useful or required in order to effect trademark registrations in the Territory, and (iii) cooperate in arranging for maintaining, varying or canceling such recordations or registrations in the event of amendment to, or termination of, this Agreement for any reason. Nothing in this Agreement shall be construed as a warranty on the part of Thermage regarding any Thermage Marks, including without limitation, that use of the Thermage Marks will not infringe the rights of any third parties. In the event that Distributor learns of any infringement or imitation or threatened infringement or imitation of any Thermage Mark, or any passing off, Distributor shall forthwith notify Thermage or its authorized representative in writing giving particulars thereof and Distributor shall provide necessary information and assistance to Thermage, or its authorized representatives, in the event that Thermage decides that proceedings should be commenced or defended. Nothing herein, however, shall be deemed to require Thermage to enforce the Thermage Marks against others, and Distributor shall not institute any suit or take any action on account of infringement or imitation of the Thermage Marks without the prior written consent of Thermage.

E.      Distributor agrees that it shall not use the Thermage Marks in combination with any other trademark or trade name of its own or any third party or as a component of its business to create a composite trademark or logo or to characterize its business in any other way; and that it will use the Thermage Marks only on, or in connection with, the Product, and will not use or permit use of the Thermage Marks in connection with goods other than the Product; and that the Thermage Marks and the goodwill associated therewith are and shall continue to be the exclusive property of Thermage.

13.     **WARRANTIES**

A.      Limited Warranty. A limited Product warranty is set forth in the End User Agreement attached hereto. Distributor shall pass on to Customers the foregoing standard limited warranties and disclaimers set forth in the End User Agreement. Notwithstanding the foregoing, Thermage shall provide Distributor with a fourteen (14) month Product warranty period from the date of Thermage's invoice to Distributor, for each System purchased by Distributor. Distributor further agrees not to represent the Products in a manner that is inconsistent with the Product label claims, this Agreement, Documentation or to otherwise misrepresent the Products in excess of those claims in the Documentation, this Agreement or that Distributor knows, or has reason to believe are misleading to Customers or any other third party.

B.      General Warranty. Each Party represents and warrants (i) it is authorized to execute and deliver this Agreement and to perform its obligations hereunder, and (ii) the execution, delivery and performance of this Agreement by it does not conflict with any agreement, instrument or understanding, oral or written, to which it is a Party or by which it may be bound, nor violate any law or regulation of any court, governmental body or administrative agency having authority over it.

C.      Disclaimer. EXCEPT AS EXPRESSLY SET FORTH ABOVE, THERMAGE MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, WITH RESPECT TO THE SOFTWARE AND PRODUCTS. THERMAGE AND ITS SUPPLIERS HEREBY



SPECIFICALLY DISCLAIM ALL OTHER EXPRESS, STATUTORY AND IMPLIED REPRESENTATIONS, WARRANTIES AND CONDITIONS INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT AND THE IMPLIED CONDITION OF SATISFACTORY QUALITY. EXCEPT AS EXPRESSLY STATED IN THIS SECTION 13, ALL SOFTWARE IS LICENSED AND ALL PRODUCTS ARE PROVIDED ON AN "AS IS" BASIS WITHOUT WARRANTY. DISTRIBUTOR ASSUMES THE ENTIRE COST OF ANY DAMAGE RESULTING FROM THE INFORMATION CONTAINED IN OR COMPILED BY THE SOFTWARE. DISTRIBUTOR ASSUMES ALL RESPONSIBILITIES FOR SELECTION OF THE SOFTWARE AND PRODUCTS TO ACHIEVE DISTRIBUTOR'S INTENDED RESULTS, AND FOR THE INSTALLATION OF, USE OF, AND RESULTS OBTAINED FROM THE SOFTWARE AND PRODUCTS.

14.    **LIMITATION OF LIABILITY**

A.    IN NO EVENT WILL THERMAGE OR ITS SUPPLIERS BE LIABLE TO DISTRIBUTOR, ANY AUTHORIZED SUB-DISTRIBUTORS, CUSTOMERS OR ANY OTHER THIRD PARTY OR ENTITY FOR ANY DAMAGES, INCLUDING BUT NOT LIMITED TO, COSTS OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES, INCIDENTAL, SPECIAL, CONSEQUENTIAL, EXEMPLARY, SPECIAL, INCIDENTAL OR INDIRECT DAMAGES, AND INCLUDING BUT NOT LIMITED TO, LOSS OF DATA, LOSS OF PROFITS, BUSINESS INTERRUPTION, LOSS OF BUSINESS INFORMATION, OR OTHER PECUNIARY LOSS ARISING FROM THE USE OF (OR INABILITY TO USE) THE SOFTWARE, DOCUMENTATION, THE DATA COLLECTED OR CREATED IN THE USE OF THE SOFTWARE, THE ACCOMPANYING DOCUMENTATION OR THE PRODUCT, NO MATTER HOW CAUSED AND ON ANY THEORY OF LIABILITY. THE FOREGOING LIMITATIONS WILL APPLY NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY HEREIN.

B.    IN NO EVENT SHALL THERMAGE'S TOTAL LIABILITY TO DISTRIBUTOR, ANY CUSTOMER, ANY AUTHORIZED SUB-DISTRIBUTOR, OR ANY OTHER THIRD PARTY OR ENTITY FOR DAMAGES IN ANY ONE OR MORE CAUSE OF ACTION EXCEED THE AMOUNT PAID BY DISTRIBUTOR FOR THE PRODUCT WITHIN THE TWELVE MONTHS PRIOR TO THE DATE THE CLAIM AROSE.

15.    **MISCELLANEOUS PROVISIONS**

A.    Indemnification.

(ii)    Distributor shall indemnify, defend and hold harmless Thermage and its affiliates, employees, directors, officers, employees, agents and representatives ("Thermage Representatives") against any and all claims, suits, losses, damages, costs, fees and expenses (including reasonable attorney's fees) resulting from or arising out of (a) any breach of this Agreement by Distributor, Sub-distributors, or their agents, contractors or affiliates; (b) the shipment, storage, handling, promotion, marketing, distribution or sale of the Products by Distributor or Sub-Distributors, or their agents, contractors or affiliates; and (c) the negligence or misconduct of Distributor or their agents, contractors or affiliates. The foregoing indemnity shall not extend to claims arising out of a Product defect that rendered the Product unreasonably dangerous at the time Thermage delivered the Product to Distributor.

(iii)    Distributor agrees not to join Thermage or any Thermage representative as a party defendant or plaintiff, or any interest thereof, in any action at law or in equity or in any other proceeding, regardless of the descriptive classification, arising out of the liabilities, duties, and responsibility which Distributor has assumed or agreed to perform in connection with this Agreement. Distributor shall promptly notify Thermage of any and all actions at law or equity or claims or governmental administrative proceedings arising out of the operation or performance of this Agreement.

 

(iii)     Thermage shall indemnify, defend and hold harmless Distributor and its affiliates, employees, directors, officers, employees, agents and representatives ("Distributor Representatives") against any and all third party claims, suits, losses, damages, costs, fees and expenses (including reasonable attorney's fees) in connection with, or arising out of personal injury liability that is proximately and solely caused by a manufacturing defect in the Products supplied to Distributor by Thermage, provided that: (a) such defect existed at the time the Product was shipped by Thermage; (b) no modifications in design have been made by or with the approval of Distributor or by Customer; (c) the Product has not been subject to misuse, abuse, negligence or accident; (d) the Product has been used in accordance with its Documentation; and (e) Distributor promptly notifies Thermage of any such claims, gives Thermage sole control over the defense and/or settlement of such claims, and provides Thermage with full information and reasonable assistance in the defense of such claims.

B.     Force Majeure. A Party shall not be responsible or liable for or deemed in breach or default hereof or be subject to any claim by another (including without limitation any claims to pay damages or penalties for delays) because of its failure or omission to perform or delay in the performance of its obligations hereunder due to a contingency beyond its reasonable control, such as disruptions of transportation facilities, inability to obtain Consumables or materials, failures or breaches by suppliers, acts of government, strikes, labor disputes, power or telecommunications disruptions, judicial action, or any other act of God.

C.     Further Assurances. Each Party agrees to cooperate fully with the other Party and to execute such further instruments, documents and agreements and to give such further written assurances, as may be reasonably requested by the other Party, to better evidence and reflect the transactions described in and contemplated by this Agreement, and to carry into effect the intents and purposes of this Agreement.

D.     Compliance with Laws. Each Party warrants that in performance of work under this Agreement it has complied with or shall comply with all applicable federal, state, local laws and ordinances now or hereafter enacted including, but not limited to export laws and regulations.

E.     Relationship of Parties. The Parties are independent contractors under this Agreement and no other relationship is intended, including a partnership, franchise, joint venture, agency, employer/employee, fiduciary, master/servant relationship, or other special relationship. Neither Party shall act in a manner that expresses or implies a relationship other than that of independent contractor, nor shall either Party have the authority to bind the other Party.

F.     No Third Party Beneficiaries. Unless otherwise expressly provided, no provisions of this Agreement are intended or shall be construed to confer upon or give to any person or entity other than Distributor and Thermage (and their authorized assignees under Section 15(I)) any rights, remedies or other benefits under or by reason of this Agreement.

G.     Equitable Relief. Each Party acknowledges that a breach by the other Party of any confidentiality or proprietary rights provision of this Agreement may cause the non-breaching Party irreparable harm, for which the award of damages would not be adequate compensation. Consequently, the non-breaching Party may institute an action to enjoin the breaching Party from any and all acts in violation of those provisions, which remedy shall be cumulative and not exclusive, and a Party may seek the entry of an injunction enjoining any breach or threatened breach of those provisions, in addition to any other relief to which the non-breaching Party may be entitled at law or in equity.

H.     Notices. Any notice required or permitted to be given by either Party under this Agreement shall be in writing and shall be personally delivered or sent by a reputable overnight mail service (e.g., Federal Express), or by first class mail (certified or registered), or by facsimile confirmed by first class mail (registered or certified), to the other Party. Notices will be deemed effective (i) three (3) working days after deposit, postage prepaid, if mailed, (ii) the next day if sent by overnight mail, or (iii) the same day if sent by facsimile and confirmed as set forth above. A copy of any notice shall be sent to the following:

If to Distributor:
Bel Conor International, Ltd.
Unit 1602, 16th Floor, Yue Xiu Building
160-174 Lockhart Road
Wanchai, Hong Kong
Attn: Michael Yam, General Manager
Fax: 852-25275116
E-mail: Michael@belconar.com

If to Thermage:
Thermage, Inc.
25881 Industrial Boulevard
Hayward, California 94545
U.S.A.
Attn: Stephen J. Fanning, President & CEO
Fax: 510-782-2287
E-mail: sfanning@thermage.com

I.    Assignment.  Distributor may not assign or otherwise transfer its rights or delegate its obligations hereunder, either in whole or in part, whether by operation of law or otherwise (including, without limitation, by way of asset or stock acquisition, merger or consolidation), without the prior written consent of Thermage.  Thermage may assign or transfer this Agreement without notice.  Any attempted assignment or delegation without the Thermage's written consent will be null and void.  Subject to the foregoing, the rights and liabilities of the Parties under this Agreement will bind and inure to the benefit of the Parties' respective successors and permitted assigns.

J.    Governing Law and Jurisdiction.  This Agreement shall be governed by and construed under the laws of the State of California, U.S.A, without reference to its conflict of law principles.  This Agreement shall not be governed by the 1980 United Nations Convention on Contracts for the International Sale of Goods.  Subject to Section 15(K), Distributor hereby expressly consents to (i) the personal and exclusive jurisdiction and venue of the federal and state courts within California with respect to matters relating to this Agreement, (ii) service of process being effected upon it by registered mail sent to the address set forth at the beginning of this Agreement, and (iii) the uncontested enforcement of a final judgment from such court in any other jurisdiction wherein Distributor or any of its assets are present.

K.    Arbitration.  In the event any dispute or claim arises out of or relates to this Agreement, or the interpretation, making, performance, breach or termination thereof (each a "Dispute"), the aggrieved Party shall notify the other Party in writing of such Dispute, and the Parties shall attempt to resolve such Dispute in good faith.  If, within thirty (30) days of written notice referenced above, the Parties have not succeeded in resolving the Dispute, the Parties shall submit such Dispute to, and such Dispute shall be finally resolved by, binding arbitration.  The arbitration will be conducted in San Francisco, California, U.S.A, in accordance with the rules of the International Arbitration Rules of the American Arbitration Association ("Rules") existing as of the Effective Date and by one (1) neutral arbitrator (unless otherwise agreed in writing by the parties) appointed in accordance with the Rules.  The arbitrator appointed to conduct the arbitration must agree to render his or her opinion within thirty (30) calendar days of the final arbitration hearing.  Judgment on the award so rendered may be entered in any court having jurisdiction thereof.  In any arbitration pursuant to this Agreement, the arbitrators shall apply the laws of the State of California, U.S.A, without reference to conflicts of law principles.  Any monetary award shall be in U.S. dollars and the arbitration shall be conducted in the English language.  All documents and evidence submitted for arbitration pursuant to this Agreement must be in the English language or submitted with an English translation.  The cost of mediation and arbitration shall be shared equally by the Parties.  Notwithstanding this Section 15(K), either party may at any time apply to a court of competent jurisdiction for relief in the form of a temporary restraining order, preliminary injunction, or other provisional remedy pending final determination of a claim through arbitration in accordance with this Section.

I.    Legal Expenses.  The prevailing Party in any legal action brought by one Party against the other to enforce or interpret this Agreement shall be entitled, in addition to any other rights and remedies it may have, to reimbursement for its costs and expenses incurred in action or arbitration including, without limitation: (i) court and arbitration costs and reasonable attorneys' fees; and (ii) a reasonable amount for costs and attorney fees to be incurred in collecting any money judgment or award or otherwise enforcing each order, judgment, or decree resulting from such action or arbitration entered in the claim for relief, action, or other proceeding.

M.    Currency Control. Distributor represents and warrants that as of the Effective Date, no applicable currency control laws prevent the payment to Thermage of any amounts due to Thermage under this Agreement. Distributor agrees to promptly notify Thermage of any currency control laws that may affect Distributor's ability to make payment of any of the amounts due to Thermage under this Agreement.

N.    Language. This Agreement is in the English language only, which language will be controlling in all respects, and all versions hereof in any other language will not be binding on the Parties hereto. All communications and notices to be made or given pursuant to this Agreement must be in the English language. The Parties hereto confirm that it is their wish that this Agreement, as well as other documents relating hereto, including without limitation notices, have been and will be written in the English language only.

O.    Government Approvals. Distributor represents and warrants that, as of the Effective Date of this Agreement, no consent, approval or authorization of, or designation, declaration or filing with, any governmental authority in the Territory which has not been made or obtained by Distributor prior to the Effective Date is required in connection with the valid execution, performance and delivery of this Agreement. Distributor shall be responsible for timely filings of this Agreement with any required government agencies or commissions in the Territory. In the event any such agency or governmental entity objects to or disapproves of this Agreement or any provision hereof, Thermage shall have the right, in its discretion, to immediately terminate the Agreement.

P.    Inspections by Government Agencies. With respect to any adverse event or finding affecting the Products, Distributor shall promptly notify Thermage of any inspections by U.S. and foreign national, federal, state or local regulatory agencies (including, without limitation, FDA, EPA, EEOC, OSHA, and corresponding or similar foreign agencies or entities, state agencies or building code inspectors) of its facilities and shall provide Thermage with the results of any such inspections, including actions taken by Distributor or any other entity to remedy conditions cited in such inspections. Without limiting the generality of the foregoing, Distributor shall provide copies of any written inspection reports issued by such agencies and all correspondence between Distributor and the agency involved. Distributor shall cooperate fully with any such regulatory entity during any such inspections. Distributor will give Thermage prompt written notice of any inspections relating to the Products.

Q.    Export Restrictions. The Parties acknowledge the Products may be subject to the export control laws and regulations of the United States, and any amendments thereof. Each Party agrees that it will not transfer, deal with, export or re-export such Products and Deliverables, directly or indirectly, either to (i) any countries that are subject to United States export restrictions, (ii) any third party who a Party knows or has reason to know will utilize them in the design, development or production of nuclear, chemical or biological weapons, or (iii) any third party who has been prohibited from participating in United States export transactions by any federal agency of the United States government.

R.    Foreign Corrupt Practices Act. In conformity with the United States Foreign Corrupt Practices Act and with Thermage's established corporate policies regarding foreign business practices, Distributor and its employees and agents shall not directly or indirectly make an offer, payment, promise to pay, or authorize payment, or offer a gift, promise to give, or authorize the giving of anything of value for the purpose of influencing an act or decision of an official of any government within the Territory or the United States Government (including a decision not to act) or inducing such a person to use his influence to affect any such governmental act or decision in order to assist Thermage in obtaining, retaining or directing any such business.

S.    Basis of the Bargain. Each Party recognizes and agrees that the warranty disclaimers and liability and remedy limitations in this Agreement are materially bargained for and that such warranty disclaimers and liability and remedy limitations have been taken into account and reflected in determining the consideration to be given by each Party to enter into this Agreement.

T.    Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any applicable rule of law or public policy, such term or provision of this

Agreement will be enforced to the maximum extent permissible by applicable law so as to effect the intent of the parties, and all other conditions and provisions of this Agreement will nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated is not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties will negotiate in good faith to modify this Agreement so as to affect the original intent of the Parties as closely as possible.

       U.    No Waiver; Remedies Cumulative. Any waiver of the provisions of this Agreement or of a Party's rights or remedies under this Agreement must be in writing to be effective. No failure or delay on the part of any Party in the exercise of any right hereunder will impair such right or be construed to be a waiver of, or acquiescence in, any breach of any provision of this Agreement, nor will any single or partial exercise of any such right preclude other or further exercise of, any other right. All rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available.

       V.    No Third Party Beneficiaries. The Parties expressly agree that there are no third party beneficiaries to this Agreement, whether intended or otherwise.

       W.    Entire Agreement. This Agreement, including all exhibits and the End User Agreement constitute the entire agreement between the Parties with respect to the subject matter hereof, and supersedes and replaces all prior and contemporaneous understandings or agreements, written or oral, regarding such subject matter. Except as set forth in Section 15(T), this Agreement may not be amended, except by a writing signed by both Parties.

       X.    Headings. Headings used in this Agreement are for ease of reference only and shall not be used to interpret any aspect of this Agreement.

       Y.    Counterparts. This Agreement may be executed in two counterparts, each of which will be an original and which together will constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be signed by their duly authorized representatives in duplicate as of the Effective Date.

Thermage, Inc.

Bel Conor International, Ltd.

By: _____

By: _____

Name: Laureen DeBruin

Name: _____

Title: Chief Financial Officer

Title: _____



# International Distributor Price List

*Effective May 30, 2006*

## Equipment

| ThermaCool TC System<br>• Includes: | | | Distributor<br>Price | Refurbished<br>Price | Suggested<br>Physician<br>Price |
|---|---|---|---|---|---|
| TG-1A-115 | RF Generator | | 29,282.50 | 29,282.50 | 34,450.00 |
| TM-1A | Cooling Module | | | * SA24 $0.00 w/<br>refurbished<br>system | |
| TH-1 (2) | Handpieces | | | | |
| TS-1 | Device Cart | | | | |

## Warranty

| SA24 | 24 Month Extended Warranty -RFG,CM, Handpieces<br>*(at time of RFG, CM & Handpieces purchase)* | 2,400.00 | 3,000.00 |
|---|---|---|---|
| | 24 Month Extended Warranty -RFG,CM, Handpieces<br>*(if purchased within 12 months of initial system purchase)* | 3,600.00 | 4,500.00 |

| ThermaCool Component Pricing | | Distributor<br>Price | Suggested<br>Physician<br>Price |
|---|---|---|---|
| TG-1A-115 | RF Generator | 19,847.50 | 23,500.00 |
| TM-1A | Cooling Module | 4,972.50 | 5,850.00 |
| TH-1 | Handpiece | 2,380.00 | 2,800.00 |
| TS-1 | Device Cart | 1,190.00 | 1,400.00 |
| TD-1 | Table Top Mounting Kit | 361.25 | 425.00 |

## Supplies

| Reorder # | Product | Packaging | Distributor<br>Price | Suggested<br>Physician<br>Price |
|---|---|---|---|---|
| TT1.00C1-150 | Treatment Tip, 1cm2, 150 REP | 6 Pack | 715.20 | 894.00 |
| TT1.00C1-300 | Treatment Tip, 1cm2, 300 REP | 6 Pack | 1,214.40 | 1,518.00 |
| TT1.00C2-150 | Fast Parameter Tip, 150 REP | 8 Pack | 869.20 | 1,074.00 |
| TT1.00C2-450 | Fast Parameter Tip, 450 REP | 6 Pack | 1,675.20 | 2,094.00 |
| TT1.50C1-200 | Big Fast Treatment Tips, 1.5cm2, 200 REP | 6 Pack | 1,195.20 | 1,494.00 |
| TT1.50C1-300 | Big Fast Treatment Tips, 1.5cm2, 300 REP | 6 Pack | 1,435.20 | 1,794.00 |
| TT1.50C1-450 | Big Fast Treatment Tips, 1.5cm2, 450 REP | 6 Pack | 1,800.00 | 2,250.00 |
| TT1.50C1-600 | Big Fast Treatment Tips, 1.5cm2, 600 REP | 6 Pack | 2,155.20 | 2,694.00 |
| TT3.00C1-100 | Treatment Tips, 3.0cm2, 100 REP | 6 Pack | 955.20 | 1,194.00 |
| TT3.00C1-200 | Treatment Tips, 3.0cm2, 200 REP | 6 Pack | 1,195.20 | 1,494.00 |
| TT3.00C1-300 | Treatment Tips, 3.0cm2, 300 REP | 6 Pack | 1,435.20 | 1,794.00 |
| TT3.00C1-400 | Treatment Tips, 3.0cm2, 400 REP | 6 Pack | 1,675.20 | 2,094.00 |
| TT3.00C1-500 | Treatment Tips, 3.0cm2, 500 REP | 6 Pack | 1,915.20 | 2,394.00 |

Initial:



# International Distributor Price List
### Effective May 30, 2006

## Supplies
## (Cont'd)

| Reorder # | Product | Packaging | Distributor Price | Suggested Physician |
|---|---|---|---|---|
| TT3.00C1-600 | Treatment Tips, 3.0cm2, 600 REP | 6 Pack | 2,155.20 | 2,694.00 |
| TT0.25B1-100 | Treatment Tips, 0.25cm2, 100 REP | 6 Pack | 475.20 | 594.00 |
| TT0.25B1-225 | Treatment Tips, 0.25cm2, 225 REP | 6 Pack | 859.20 | 1,074.00 |
| TK-3.00 | Skin Marking Paper, 3.0cm2 | 6 Pack | 28.00 | 35.00 |
| TK-1.50 | Skin Marking Paper, 1.5cm2 | 6 Pack | 28.00 | 35.00 |
| TK-1.00 | Skin Marking Paper, 1.00cm2 | 6 Pack | 28.00 | 35.00 |
| TK-0.25 | Skin Marking Paper, 0.25cm2 | 6 Pack | 28.00 | 35.00 |
| TF-2 | Coupling Fluid 15ml | 6 Pack | 38.40 | 48.00 |
| TF-2-30 | Coupling Fluid 30ml | 6 Pack | 72.00 | 90.00 |
| TR-1 | Return Pads | 12 Pack | 57.60 | 72.00 |
| TC-1-4 | Cryogen Coolant Canisters | 4 Each | 79.20 | 99.00 |
| TW-1 | Footswitch | 1 Each | 250.75 | 295.00 |
| TP-1 | RFG Cable, Type A | 1 Each | 212.50 | 250.00 |

Initial: ___

## EXHIBIT A
## THERMAGE/DISTRIBUTOR PRODUCT AND PRICE LIST AND TERMS

### EXAMPLE
Hardware Distributor Price 15% off US Physician List Price (*Effective May 30, 2006*)
All amounts in USD

**EQUIPMENT**
($34,450.00)   ThermaCool System including:
(1) TM-1A Cooling Module
(1) TG-1A-115 RF Generator or TG-1A-230 RF Generator
(2) TH-1 Handpieces
(1) TS-1 Cart
x   .85   15% Commission on Equipment
$29,282.50   Net Thermage Price to DISTRIBUTOR (Bel Conor International, Ltd.)

($2,800.00)   (1) TH-1 Additional Handpiece
x   .15
$2,380.00   Net Thermage Price to DISTRIBUTOR (Bel Conor International, Ltd.)

**CONSUMABLES**
($5,874.00)   (18) "Consumable Kits" including: .
x   .80   20% Commission
$4,699.20   Net Price to DISTRIBUTOR (Bel Conor International, Ltd.)

(3) Boxes Treatment Tips, including:

| | |
|---|---|
| 1 box TT3.00C1-200 | $1,494.00 |
| 1 box TT1.50C1-300 | $1,794.00 |
| 1 box TT3.00C1-400 | $2,094.00 |
| (2) Pkgs TR-1 Return Pads | $ 144.00 |
| (1) Pkgs TK-1.50 Skin Marking Paper | $ 35.00 |
| (2) Pkgs TK-3.00 Skin Marking Paper | $ 70.00 |
| (3) Pkgs TF-2   Coupling Fluid | $ 144.00 |
| (1) Pkg TC-1-4 (4) ea/pk Cryogen Coolant Canisters | $ 99.00 |

Total $5,874.00

*Note:* Thermage requires at a minimum that Distributor sell a new Customer a "Starter Kit" with each new System sale of at least (18) treatment tips with associated Consumables.

Initial: ____

### Trademarks

Thermage
ThermaCool
ThermaCool TC
ThermaTip

### Documents

ThermaCool TC™ System Quick Start Safety/Training Guide 41211A
ThermaCool TC™ Technical Users Manual
ThermaCool TC Radio Frequency System Training Curriculum
ThermaCool PowerPoint Presentations on Global Sales Training Certification and Global Sales & Installation dated September 9, 2005

### Terms

1.  **Shipments** - EX WORKS Thermage facility.

2.  **Warranty**- Thermage shall pay transportation costs in each direction.

3.  **Service** – Distributor shall pay transportation costs in each direction.

4.  All Second Level Support (Service and Warranty work) to be accomplished by Thermage under the terms of this Agreement.

5.  Each System order will be accompanied by a minimum Consumable order of eighteen (18) Consumable Kits (which will support eighteen (18) patient treatments).

6.  **Minimum Performance Requirements** - Minimum Consumable quota shall be eight (8) tips per month, four (4) months after System purchase/installation with associated components (i.e. grounding pads, coupling fluid, cryogen).

7.  **Minimum Annual Hardware Quota** – Twelve (12) Systems for the first year (three (3) of which shall be purchased for use as Demonstration/Loaner Systems). Second year quota established mutually by parties during the 4th quarter of year one and computed on a quarterly basis.

8.  Distributor will stock replacement Consumable inventory for Customers.

9.  During the term of this Agreement, Distributor will secure sufficient Demonstration/Loaner Systems to support Customer base. At a minimum, one (1) Demonstration/Loaner System will be purchased prior to acceptance/shipment of any Customer order. Distributor will purchase Demonstration/Loaner Systems in a ratio of one (1) System for every twenty (20) Customer installations until a minimum of four (4) Demonstration/Loaner Systems have been secured. Therefore, upon the 21st Customer installation, Distributor shall purchase its second Demonstration/Loaner System. Distributor shall not be required to purchase Consumables when securing Demonstration/Loaner Systems.

**DISTRIBUTOR DEMONSTRATION/LOANER SYSTEM PRICING AND PAYMENT TERMS:**
All amounts in USD

$34,450 Distributor ThermaCool Demonstration/Loaner System includes:

        (1) TM-1A Cooling Module
        (1) TG-1A-230 Generator
        (2) TH-1 Handpieces
        (1) TS-1 Cart

X    .70      30% Distributor Discount
$ 24,115     **Net Thermage Price to Distributor for Each Demonstration/Loaner System.**

Payment for each Demonstration/Loaner System purchased by Distributor shall be made in full ninety (90) days from the date of Thermage's invoice under the following extended payment terms: three (3) equal, monthly and consecutive payments. The

first payment is due to Thermage within thirty (30) days from the date of Thermage's invoice; the second payment is due within sixty (60) days; and final payment is due within ninety (90) days.

Initials:

## EXHIBIT B
## END USER AGREEMENT

| **Distributor**<br>Contact:<br>Contact Phone: | END USER AGREEMENT<br><br>Customer Bill To:　　　　Customer Ship To: |
|---|---|

| DATE | SHIP VIA | EX WORKS | PAYMENT METHOD | |
|---|---|---|---|---|
| | | Thermage's Shipping Point | Prepaid | |
| **QUANTITY** | **ITEM NO.** | **PRODUCT DESCRIPTION**<br>**PRODUCTS** | **UNIT**<br>**COST** | **EXTENDED**<br>**COST** |
| 1 | TG-115-1A<br>or TG-1A-230 | ThermaCool TC System, including:<br>ThermaCool TC System<br>　•　RF Generator (TG-1A-115/TG-1A-230)<br>　•　Cooling Module (TM-1A)<br>　•　Device Cart<br>　•　Accessory Cables<br>　•　2 Handpieces (TH-1) | | |
| 1 | TT1.00C1-150 | Standard Treatment Tips, 1cm2, 150 REP (6 Pkg.) | | |
| 1 | TT1.00C1-300 | Standard Treatment Tips, 1cm2, 300 REP (6 Pkg.) | | |
| 1 | TT1.00C2-150 | Fast Parameter Treatment Tips, 150 REP (6 Pkg.) | | |
| 1 | TT1.00C2-450 | Fast Parameter Treatment Tips, 450 REP (6 Pkg.) | | |
| 1 | TT1.50C1-200 | Big Fast Treatment Tips, 200 REP (6 Pkg.) | | |
| 1 | TT1.50C1-300 | Big Fast Treatment Tips, 300 REP (6 Pkg.) | | |
| 1 | TT1.50C1-450 | Big Fast Treatment Tips, 450 REP (6 Pkg.) | | |
| 1 | TT1.50C1-600 | Big Fast Treatment Tips, 600 REP (6 Pkg.) | | |
| 1 | TT3.00C1-100 | Treatment Tips, 3.0cm2, 100 REP (6 Pkg.) | | |
| 1 | TT3.00C1-200 | Treatment Tips, 3.0cm2, 200 REP (6 Pkg.) | | |
| 1 | TT3.00C1-300 | Treatment Tips, 3.0cm2, 300 REP (6 Pkg.) | | |
| 1 | TT3.00C1-400 | Treatment Tips, 3.0cm2, 400 REP (6 Pkg.) | | |
| 1 | TT3.00C1-500 | Treatment Tips, 3.0cm2, 500 REP (6 Pkg.) | | |
| 1 | TT3.00C1-600 | Treatment Tips, 3.0cm2, 600 REP (6 Pkg.) | | |
| 1 | TT0.25B1-100 | Treatment Tips, 0.25cm2, 100 REP (6 Pkg.) | | |
| 1 | TT0.25B1-225 | Treatment Tips, 0.25cm2, 225 REP (6 Pkg) | | |
| 1 | TK-3.00 | Skin Marking Grid Paper (6 Pack) | | |
| 1 | TK-1.00 | Skin Marking Grid Paper (6 Pack) | | |
| 2 | TK-1.50 | Skin Marking Grid Paper, Big Fast Tip (6 Pack) | | |
| 1 | TK0.25 | Skin Marking Paper, 0.25cm2 | | |
| 3 | TF-2 | Coupling Fluid 15ml (6 Pack) | | |
| 1 | TF-2-30 | Coupling Fluid 30ml (6 Pack) | | |
| 1 | TC-1-4 | Cryogen Coolant Canister (4 Pack) | | |
| 1 | TW-1 | Footswitch | | |
| 1 | TP-1 | RFG Cable, Type A | | |
| 2 | TR-1 | Return Pads (12 Pack) | | |

Sub-Total:

Shipping/Insurance:

Sales Tax:

TOTAL:

Initial:

CAUTION: PRODUCTS MAY ONLY BE USED FOR THEIR INTENDED AND APPROVED USES, IN THE COUNTRY THEY WERE ORIGINALLY SHIPPED TO, BY AUTHORIZED USERS WHO HAVE BEEN PROPERLY TRAINED IN THEIR USE.

The End User Agreement including the Terms and Conditions of Sale for Thermage® Products governs sale of the Products. No term or condition contained in Customer's purchase order, acknowledgment or other business form that Customer may use in connection with the transactions contemplated by this Agreement, shall any effect on the rights, duties or obligations of the parties hereunder, or otherwise modify this Agreement.

**AGREED:**
**CUSTOMER**
I am authorized to sign this End User Agreement on Customer's behalf.

_____        Date:_____
Name and Title

## EXHIBIT B - END USER AGREEMENT (Cont'd)
## TERMS AND CONDITIONS OF SALE FOR THERMAGE® PRODUCTS

**Definitions.**

"Authorized User" shall mean a Licensed Physician or professional with substantial medical education and training that both: (a) possesses the training and qualifications required by applicable law to use the Products in accordance with this Agreement; and (b) has successfully completed all training required by Thermage and/or Distributor regarding the safe and proper use of the Products.

"Country of Use" shall mean, with respect to each Product, the country to which such Product was originally shipped by Thermage to the original purchaser of such Products.

"Distributor" shall mean: Bel Conor International, Ltd., Unit 1602, 16th Floor, Yue Xiu Building, 160-174 Lockhart Road, Wanchai, Hong Kong.

"Licensed Physician" shall mean a medical doctor in good standing that is licensed to practice medicine in the relevant jurisdiction at the time of the sale of the Products and Supplies.

"Products" shall mean (a) the Thermage products, including the System and initial Supplies as set forth on the attached cover sheet order form, (b) additional Systems and Supplies as identified on subsequent order forms as the parties may agree upon from time to time, and (c) additional Supplies ordered by Customer and accepted by Thermage. Thermage reserves the right to update or discontinue specific Products from time to time without advance notice to Customer or Distributor.

"Supplies" shall mean any product sold by Thermage for use in connection with the System. Supplies that are currently offered by Thermage are set forth on Exhibit A of this Agreement.

"System" shall mean the Thermage® ThermaCool™ System and durable components thereof and any updates or upgrades thereto provided by Thermage to Customer under this Agreement.

**Purchase of Products.** Subject to the terms and conditions of this Agreement: (a) Customer agrees to purchase and Distributor agrees to sell the Products identified on the cover page to this Agreement and any other Customer orders for Products that are accepted by Distributor ("Purchased Products"). Customer acknowledges and agrees that all use of the Purchased Products is subject to and governed by the terms and conditions of this Agreement. Notwithstanding the foregoing, the Software components of the Products are licensed to Customer pursuant to this Agreement and are not sold to Customer.

**Restrictions on the Use of the Products and Systems.** **CUSTOMER'S USE OF THE PRODUCTS ARE SUBJECT TO THE FOLLOWING RESTRICTIONS:**

  (a) Sale of the System or Products does not convey any license, expressly or by implication, to manufacture, duplicate, or otherwise copy or reproduce the Products.

  (b) Customer may not sell, donate or otherwise transfer Products to any other person or entity unless: (i) Thermage has provided its prior consent to such sale, donation or transfer, such consent not to be unreasonably withheld; and (ii) the proposed transferee has entered into an End User Agreement with Distributor solely for use of such Products in the Country of Use. Except where such restriction is prohibited by law, Customer is prohibited from tampering with, modifying, or assisting any third party in modifying the Products. MODIFYING OR ALTERING THE PRODUCTS MAY ENDANGER PATIENT SAFETY. Except where such restriction is prohibited by law, Customer is prohibited from reverse engineering or attempting to reverse engineer the Products.

  (c) The Products shall only be used by an Authorized User in the Country of Use, and any other use constitutes a material breach of this Agreement. ALLOWING THE USE OF THE PRODUCTS OR SYSTEMS BY PERSONS OTHER THAN AUTHORIZED USERS UNDER THE ACTIVE SUPERVISION OF A LICENSED PHYSICIAN MAY VIOLATE APPLICABLE LAW AND MAY ENDANGER PATIENT SAFETY. For the purposes of clarification, "active supervision" shall mean having a Licensed Physician available during the performance of any procedure using the System on a patient. With respect to any Authorized User that is not an employee of Customer, Customer shall bind such Authorized User to the terms and conditions of this Agreement. Customer shall indemnify, defend and hold Thermage harmless from and against any and all liabilities, losses, damages, settlements, claims, actions, suits, penalties, fines, costs and expenses (including, without limitation, reasonable attorneys' fees and other expenses of litigation) incurred by any Thermage, relating to, arising from or occurring as a result of any use of the Products by any person or entity other than an Authorized User of Customer.

  (d) Customer agrees and warrants that: (i) Customer will use the Products only for their intended and approved uses and in accordance with all Thermage documentation, including without limitation, the Thermage ThermaCool System Technical User's Manual and any updates, revisions, and technical bulletins related thereto (collectively, "Documentation"); and (ii) it will ensure and represents and warrants that its employee, agents and any other users of the Products will comply with all terms and conditions of this Agreement and all Documentation in their use of the Products.

  (e) Thermage reserves the right to modify or replace, at its sole expense, the Products as Thermage deems necessary in its sole discretion and Customer shall make them reasonably available to Thermage for such modification or replacement.

(f) Thermage reserves the rights not to provide the Products or the Systems to any entity or person that it reasonably believes is using the Products or Systems in violation of the terms of this Agreement, including the restrictions set forth above. WITHOUT LIMITING THE FOREGOING, THERMAGE RESERVES THE RIGHTS TO NOT SELL ANY OF THE CONSUMABLE PRODUCTS NECESSARY FOR THE CONTINUED USE OF THE SYSTEM.

**Licenses and Ownership.** No licenses are to be implied from any term or provision of this Agreement except as required to operate the Products as provided in the Documentation. All software and firmware included as part of the Products is Thermage's copyrighted software and firmware (including, without limitation, all new version, updates and upgrades thereto delivered to Customer in connection with the Products) ("Software"), and notwithstanding anything else in this Agreement, the Software is licensed to, and not sold to, Customer. Subject to Customer's compliance with this Agreement, Thermage grants to Customer a non-exclusive, non-transferable license, under Thermage's intellectual property rights in the Software, to use the Software solely for use in the Country of Use and solely in connection with the authorized use of the Products under this End User Agreement in accordance with the Documentation, and Customer agrees not to use the Software in any other manner. Use of the Software in any other manner is prohibited. As between Customer and Thermage, Thermage retains sole title to the Software and all patents, copyrights, trade secret rights and other intellectual property rights therein and thereto. Upon Thermage's request, during Customer's normal business hours and within forty-five (45) days after such request, Customer shall grant Thermage access to each System to install any new version, update or upgrade to the Software.

**Trademarks and Advertising:** Customer shall comply with Thermage's Trademark and Advertising Guidelines, the terms and conditions of which are fully incorporated herein. Thermage makes these guidelines available in connection with its Practice Marketing Kit and upon request.

**Delivery.** All shipments under this Agreement will be Ex Works (Incoterms 2000), Thermage's shipping point, as determined by Thermage, or Distributor's shipping point. Title to (excluding title to any Software) and all risk of loss and damage shall pass to Customer at the time of delivery at the Ex Works location identified above to the carrier or forwarding agent chosen by Thermage, as applicable. Without limiting the foregoing, Customer shall be responsible for all transportation, clearance, forwarding and insurance costs related to the Thermage Products. Thermage shall use reasonable efforts to deliver the Products on the date agreed to between Customer and Distributor. Shipping, delivery, and installation dates are approximate and are based upon prompt receipt of all necessary payment and information. Thermage will not be liable for any loss, liability or damage resulting from any delay or failure to perform all or any part of this Agreement if such delay or failure is caused in whole or in part, by governmental order, strikes, floods, fires, earthquakes, acts of war (whether declared or undeclared), terrorism, or other events, occurrences, or causes beyond Thermage's control, including inability to obtain labor or materials or other production delays, in which case Thermage may postpone delivery, shipment, or installation at its option without liability.

**Installation and Acceptance.** Thermage or Distributor shall install each System at Customer's designated facility in the Country of Use. Upon successful completion of the items on the installation checklist in connection with the installation of each System, Customer will sign the delivery and acceptance form acknowledging acceptance of each such System.

**Training and Support.** Thermage or Distributor will provide Customer with one-time initial system operator and physician training. Customer will at all times ensure that Customer, its employees and agents are fully trained with respect to the Products, and that it and its employees and agents are and remain in full compliance with all federal, state, and local laws and statutes, including state medical agencies and certification boards. From time to time in Thermage's sole discretion, Thermage may provide additional training to Customer at no cost to Customer. If such training relates to the safe use of the Products (e.g., affects patient safety, operator safety, etc.), Customer shall ensure that its Authorized Users attend such training within a reasonable time after receiving written notice of such training from Thermage or Distributor.

**Governing Law and Arbitration.** This Agreement shall be governed by and construed under the laws of the State of California without regard to conflict of law principles. The parties expressly disclaim the 1980 United Nations Convention on Contracts for the International Sale of Goods. Customer consents to the jurisdiction of the federal and state courts in California and agrees that venue shall lie exclusively in San Francisco County, California. In the event any dispute or claim arises out of or relates to this Agreement, or the interpretation, making, performance, breach or termination thereof (each a "Dispute"), the aggrieved party shall notify the other party in writing of such Dispute, and the parties shall attempt to resolve such Dispute in good faith. If, within thirty (30) days of written notice referenced above, the parties have not succeeded in resolving the Dispute, the parties shall submit such Dispute to, and such Dispute shall be finally resolved by, binding arbitration. The arbitration will be conducted in San Francisco, California, U.S.A. in accordance with the rules of the International Arbitration Rules of the American Arbitration Association ("Rules") existing as of the Effective Date and by one (1) neutral arbitrator (unless otherwise agreed in writing by the parties) appointed in accordance with the Rules. The arbitrator appointed to conduct the arbitration must agree to render his or her opinion within thirty (30) calendar days of the final arbitration hearing. Judgment on the award so rendered may be entered in any court having jurisdiction thereof. In any arbitration pursuant to this Agreement, the arbitrators shall apply the laws of the State of California, U.S.A. without reference to conflicts of law principles. Any monetary award shall be in U.S. dollars and the arbitration shall be conducted in the English language. All documents and evidence submitted for arbitration pursuant to this Agreement must be in the English language or submitted with an English translation. The cost of mediation and arbitration shall be shared equally by the parties. Notwithstanding this

Initial:

section, either party may at any time apply to a court of competent jurisdiction for relief in the form of a temporary restraining order, preliminary injunction, or other provisional remedy pending final determination of a claim through arbitration in accordance with this section.

**Term and Termination.**

(a)   *Term.* This Agreement shall commence on the Effective Date and continue in force for a fixed term of one (1) year from the Effective Date, unless terminated earlier under the provisions of this Agreement. At the end of this initial one year term, this Agreement shall automatically renew for additional, consecutive one (1) year terms, unless either party provides notice to the other party of its intention not to renew the Agreement at least thirty (30) calendar days prior to the expiration of the then-current term of this Agreement.

(b)   *Termination for Cause.* If either party breaches any provision of this Agreement, then the non-breaching party may give written notice to the breaching party that, if the default is not cured within thirty (30) calendar days after receipt of such notice, this Agreement will automatically terminate. If the non-breaching party gives such notice and such breach is not cured during such thirty (30) day period, then this Agreement shall automatically terminate at the end of such thirty (30) calendar day period.

(c)   *Termination for Insolvency.* Either party may terminate this Agreement upon written notice to the other party: (a) upon the institution by the other party of insolvency, receivership or bankruptcy proceedings or any other proceedings for the settlement of its debts; (b) upon the institution of such proceedings against the other party, which are not dismissed or otherwise resolved in its favor within thirty (30) days of notice of such proceeding; (c) upon the other party making an assignment for the benefit of any creditor; or (d) upon the other party dissolving or ceasing to conduct business in the ordinary course.

(d)   *Effect of Expiration and Termination.* Notwithstanding any expiration or termination of this Agreement, all payment obligations incurred prior to expiration or termination shall survive, and the following provisions shall survive: Definitions, Restrictions on the Use of Products and Systems, Training and Support, Assignment, Export, Reservation of Rights, Term and Termination, Governing Law and Arbitration, Miscellaneous, Disclaimer, Limitation of Liability, and all other provisions which by their nature should survive expiration or termination of this Agreement.

**Miscellaneous.** This Agreement is intended by the parties as a final expression of their agreement and as a complete and exclusive statement of the terms of their agreement. In the event of a conflict between this Agreement and any other agreement entered into between Customer and Distributor, the terms and conditions of this Agreement will control. No course of prior dealings between the parties and no usage of the trade shall be relevant to supplement or explain any term used in this Agreement. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the party to be charged. If any provision of this Agreement, or the application of a provision, shall for any reason and to any extent be found invalid or unenforceable, the remainder of this Agreement, and (if appropriate) such provision to other persons or circumstances, shall remain in full force and effect and be interpreted so as best to reasonably effect the intent of the parties.

**Assignment.** This Agreement may not be assigned by Customer, in whole or in part, whether by operation of law or otherwise (including, without limitation, by way of asset or stock acquisition, merger or consolidation), without the prior written consent of Thermage. Thermage may assign or otherwise transfer this Agreement without notice. Subject to the foregoing, this Agreement will bind and inure to the benefit of the parties and their respective successors and permitted assigns. Any assignment in violation of the foregoing will be null and void and shall be deemed a material breach of this Agreement.

**Export.** Customer may not export or re-export the Product and the Software without the prior written consent of Thermage and without appropriate United States and foreign government licenses and authorizations.

**Reservations of Rights.** Thermage reserves the right at its sole option to use Distributor to carry out any of the obligations under this Agreement.

Initial:

## EXHIBIT B - END USER AGREEMENT (Cont'd)
## TERMS OF WARRANTY AND LIMITATION OF LIABILITY OF THERMAGE PRODUCTS

**Product Warranty.** Thermage warrants to Customer that, subject to the terms and conditions of this Agreement (including, without limitation, the Warranty Limitation and Disclaimer paragraphs below), the Products will be free from significant defects in materials and workmanship as follows: (a) with respect to each System, for a period of one (1) year from the date of invoice for the System, and (b) with respect to Supplies, for a period extending through the life expectancy for Supplies as communicated to Customer by Thermage or Distributor and/or published by Thermage; in each case when properly installed, maintained, and used for their approved and intended purpose. During the applicable warranty period as set forth above, Thermage will, at its option, either repair or replace any Product that does not conform to the foregoing warranty. THE EXPRESS WARRANTY ABOVE IS THE ENTIRE LIABILITY AND OBLIGATIONS OF THERMAGE AND THE SOLE AND EXCLUSIVE REMEDY FOR ANY BREACH OF ANY WARRANTY WITH RESPECT TO THE PRODUCTS AND IS IN LIEU OF ANY AND ALL OTHER REMEDIES.
**Warranty Repair.** Customer may return Products to Distributor for warranty purposes. Before returning such warranty Products to Thermage on behalf of Customer, Distributor must first obtain a return material authorization from Thermage ("RMA Number"). The RMA Number must be noted on the outside of the shipping container. Notwithstanding the above, Thermage will not accept any returns for sterile Supplies if the original packaging has been tampered with or opened, without Thermage's prior written approval.
**Warranty Limitations.** This warranty applies only to the Customer that is the original purchaser of the Product, and only so long as the Products are used for their intended and approved uses in the Country of Use. This warranty will not apply to any Product that has been used other than in accordance with the Documentation and the terms and conditions of this Agreement or has been subjected to improper operation, unauthorized repair or modification of hardware or Software, neglect, improper installation, or abuse, which includes, without limitation, improper transport of the Product or significant mechanical shock to the handpiece including without limitation dropping the handpiece or exposing the Product to freezing temperature conditions, or operation outside of the environmental specifications of the Product. This warranty is null and void if Customer breaches any provision of this Agreement or Customer or any third party not authorized by Thermage attempts to service or repair the Products (other than performing the maintenance described in the operator and technical manuals included in the Documentation).
**Disclaimer.** EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, ALL REPRESENTATIONS AND WARRANTIES OF ANY NATURE REGARDING THE SUBJECT MATTER OF THIS AGREEMENT, WHETHER EXPRESS, IMPLIED STATUTORY OR OTHERWISE, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT ARE EXPRESSLY EXCLUDED AND DISCLAIMED. THE FOREGOING WARRANTIES ARE EXCLUSIVE AND IN LIEU OF ALL OTHER REPRESENTATIONS AND WARRANTIES, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE. THERMAGE DOES NOT WARRANT THAT THE OPERATION OF THE PRODUCTS WILL BE UNINTERRUPTED OR ERROR FREE. THERMAGE MAKES NO WARRANTIES OF ANY KIND REGARDING THE TRAINING OR TRAINING MATERIALS PROVIDED BY DISTRIBUTOR OR ANY THIRD PARTY, NOR DOES THERMAGE WARRANT THAT THE TRAINING MATERIALS OR DISTRIBUTOR'S OR ANY THIRD PARTY'S CERTIFICATION CREDENTIALS COMPLY WITH FEDERAL, STATE, OR LOCAL LAWS OR STATUTES. DISTRIBUTOR HAS NO AUTHORITY TO MAKE ANY REPRESENTATIONS OR WARRANTIES THAT ARE INCONSISTENT OR IN ADDITION TO THOSE PROVIDED IN THIS AGREEMENT, AND ANY SUCH REPRESENTATIONS OR WARRANTIES MADE BY LESSOR OR ANY THIRD PARTY SHALL NOT BE BINDING UPON THERMAGE.
**Service Contract.** Thermage offers repair and maintenance services beyond the warranty period under a separate service contract. Any out-of-warranty repair services provided to Customer without a service contract shall be paid for by Customer at Thermage's then-current standard charges.
**Limitation of Liability.** TO THE MAXIMUM EXTENT NOT PROHIBITED BY APPLICABLE LAW, THERMAGE WILL NOT BE LIABLE FOR COSTS OF PROCUREMENT OF SUBSITUTE GOODS OR SERVICES, INCIDENTAL, CONSEQUENTIAL, INDIRECT, EXEMPLARY PUNITIVE OR SPECIAL DAMAGES OF ANY KIND UNDER ANY THEORY (INCLUDING NEGLIGENCE), INCLUDING BUT NOT LIMITED TO DAMAGES FOR LOSS OF REVENUE, LOSS OF DATA, LOSS OF BUSINESS OR BUSINESS OPPORTUNITY, OR OTHER FINANCIAL LOSS ARISING OUT OF OR IN CONNECTION WITH THE SALE, DELIVERY, INSTALLATION, PERFORMANCE, FAILURE, USE, OR INTERRUPTED USE OF ITS SYSTEMS OR PRODUCTS, OR THE UNAUTHORIZED USE OF THE SYSTEM OR PRODUCTS. THERMAGE'S LIABILITY FOR ANY LOSS OR DAMAGE ARISING OUT OF OR RESULTING FROM THIS AGREEMENT OR ITS PERFORMANCE OR BREACH, OR IN CONNECTION WITH THE PRODUCTS FURNISHED HEREUNDER, WILL IN NO CASE EXCEED THE FEES PAID BY CUSTOMER TO THERMAGE FOR THE SPECIFIC PRODUCT THAT GIVES RISE TO THE CLAIM. In no event will Thermage be liable for any damages resulting from Thermage's failure to meet any delivery schedule, even if Thermage has been advised of the possibility of such damages, including without limitation costs of procurement of substitute goods or services. THESE LIMITATIONS SHALL APPLY EVEN IF

THERMAGE HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY.

DistributorAgreement-BelConnvInternationalLtd-China-FINAL-090706    Page 32 of 38

Initial:

## EXHIBIT B – END USER AGREEMENT (Cont'd)
### (EXHIBIT A)

**Supplies: Reorder Numbers and List Prices**

| | | | |
|---|---|---|---|
| TT1.00C1-150 | Standard Treatment Tips, 1cm2,150 REP | 6/Pkg. | |
| TT1.00C1-300 | Standard Treatment Tips, 1cm2,300 REP | 6/Pkg. | |
| TT1.00C2-150 | Fast Parameter Treatment Tips, 150 REP | 6/Pkg. | |
| TT1.00C2-450 | Fast Parameter Treatment Tips, 450 REP | 6/Pkg. | |
| TT1.50C1-200 | Big Fast Treatment Tips, 200 REP | 6/Pkg. | |
| TT1.50C1-300 | Big Fast Treatment Tips, 300 REP | 6/Pkg. | |
| TT1.50C1-450 | Big Fast Treatment Tips, 450 REP | 6/Pkg. | |
| TT1.50C1-600 | Big Fast Treatment Tips, 600 REP | 6/Pkg. | |
| TT3.00C1-100 | Treatment Tips, 3.0cm2, 100 REP | 6/Pkg. | |
| TT3.00C1-200 | Treatment Tips, 3.0cm2, 200 REP | 6/Pkg. | |
| TT3.00C1-300 | Treatment Tips, 3.0cm2, 300 REP | 6/Pkg. | |
| TT3.00C1-400 | Treatment Tips, 3.0cm2, 400 REP | 6/Pkg. | |
| TT3.00C1-500 | Treatment Tips, 3.0cm2, 500 REP | 6/Pkg. | |
| TT3.00C1-600 | Treatment Tips, 3.0cm2, 600 REP | 6/Pkg. | |
| TT0.25B1-100 | Treatment Tips, 0.25cm2, 100 REP | 6/Pkg. | |
| TT0.25B1-225 | Treatment Tips, 0.25cm2, 225 REP | 6/Pkg. | |
| TF-2 | Coupling Fluid | 12/Pkg. | |
| TR-1 | Return Pads | 12/Pkg. | |
| TC-1 | Cryogen Coolant Canisters | 2/Pkg. | |
| TK-1.00 | Skin Marking Paper | 6/Pkg. | |
| TK-1.50 | Skin Marking Paper (Use with Big Fast Tips) | 6/Pkg. | |
| TK-0.25 | Skin Marking Paper, 0.25cm2 | 6/Pkg. | |

To order supplies contact **DISTRIBUTOR** Customer Service.

**ThermaCool TC System and Supplies Warranty Summary**
Please refer to Thermage's Terms Of Warranty and Limitation of Liability of Thermage Products for complete warranty information.

**ThermaCool TC System**

| System Component | Factory Warranty Period | Warranty Coverage (See Warranty Key for description) |
|---|---|---|
| RF Generator | 1 year from date of invoice * | Repair or replace |
| Cooling Module | 1 year from date of invoice * | Repair or replace |
| Handpiece | 1 year from date of invoice | Pro-rated credit |
| Device Cart | 1 year from date of invoice | Repair or replace |

* A 24-month Extended Service Plan is available for the RF Generator and Cooling Module. This Extended Service Plan extends the life of the Warranty period from 1 year to 3 years.

Initial: ____

## EXHIBIT B -- END USER AGREEMENT (Cont'd)
### (EXHIBIT A)

**ThermaCool TC Supplies**

| Supply Item | Factory Warranty Period | Warranty Coverage (See Warranty Key for description) |
|---|---|---|
| Treatment Tips | Through product's shelf life | Credit |
| Coupling Fluid | Through product's shelf life | Credit |
| Return Pads | Through product's shelf life | Credit |
| Skin Marking Paper | Through product's shelf life | Credit |
| Cryogen Canister | Through product's shelf life | Credit |
| Warranty Key | | Description |
| Repair or replace | Thermage will either repair or replace equipment free of charge. Shipping charges paid for by Thermage through Distributor. | |

Initial:

## EXHIBIT C
## INCIDENT INFORMATION GATHERING FORM
### (FM-0021 Rev A)

Source of Information ☐ Phone ☐ Fax ☐ Mail ☐ Returned Product ☐ Service ☐ Other:

| CUSTOMER INFORMATION | | |
|---|---|---|
| Person Reporting Information: | Title: | Date: |
| Facility: | Tel: ( ) | |
| Physician Name: | Fax: ( ) | |
| Address: | E-mail: | |
| | | |
| State/Country | Zip Code | |

| PRODUCT INFORMATION | | | | |
|---|---|---|---|---|
| Prod. Cat. No.: | Description: | Lot/serial No. | Request Return RMA number | |
| TG-1A-115 | RF Generator | | | |
| | Handpiece | | | |
| | Treatment Tip | | | |
| | | | | |
| | | | | |

Was the device being used for: ☐ treatment ☐ diagnosis ☐ Other:

| REPORT |
|---|
| Description of Event (Nature and Details): |
| |
| |
| |

| Adverse Event? | ☐ No ☐ Yes | -Serious Injury or Death: ☐ unknown ☐ No ☐ Yes |
|---|---|---|
| -Has user facility reported event to FDA? ☐ unknown ☐ No ☐ Yes | Describe: | |
| -Relationship of Device to reported incident or adverse event: | | |

| THERMAGE (To be completed by person gathering Information) | | |
|---|---|---|
| Report Taken By: | Date first reported to Thermage: | |
| Acknowledgment letter sent? ☐ No   ☐ Yes/Date: _____ | Response Requested? | ☐ No   ☐ Yes |

| THERMAGE Complaint, MDR, Incident Report Determination (Quality) | | | |
|---|---|---|---|
| Is this a complaint? | ☐ No   ☐ Yes (CF_____) | Product Service only | ☐ No   ☐ Yes |
| Is this a potential MDR? | ☐ No   ☐ Yes (complaint) | - Product Repair | ☐ No   ☐ Yes |
| Is this a potential incident Reportable Event? ☐ No   ☐ Yes | - Inquiry | ☐ No   ☐ Yes |

DistributorAgreement-BelConorInternationalLtd-China-FINAL-090706     Page 35 of 38     Initial: [signature]

| Evaluation Completed By: | Date: |
|---|---|

**Additional Information**

**Follow-Up Log**

Initial:

## EXHIBIT D

## INTERNATIONAL PHYSICIAN TRAINING RECORD (FM-0170, Rev B)
*Please Complete This Form in English*

**TRAINING RECEIVED BY:**

| Physician Name: | |
|---|---|

Clinic Name: _____

Address: _____

Telephone: _____  Fax: _____

Email: _____  Website: _____

Specialty: _____

**TRAINING PERFORMED BY:**

Distributor: _____  Training Date: _____
(Print Name)

Signature of Trainer: _____

**DESCRIPTION OF TRAINING PERFORMED:**

_____
_____
_____
_____

Physician Signature: _____  Date: _____
Print Name: _____

□  Training Effectiveness Verified by Observing Trainee Performance

---

**SPECIAL WARNING AND ACKNOWLEDGEMENT REGARDING OCULAR SHIELDS**

*Plastic ocular shields must be used with all Thermage eyelid procedures.* Trainee acknowledges that Thermage Procedure Training does NOT include training regarding the use of ocular shields. Thermage expects all practitioners employing ocular shields to independently educate and train themselves as to their safe and effective use.  WARNING: TO PREVENT SERIOUS EYE INJURY, ONLY PLASTIC OCULAR SHIELDS MAY BE USED WITH THE THERMAGE EYELID PROCEDURE.

Trainee Initials

Serial Number of RF Generator: _____

cc: Thermage Quality Assurance, Hayward, CA
For QA Use:
EZTRacker Database Updated:_____  Date:_____

**CONFIDENTIAL: Do Not Copy Without Written Permission From Thermage**

ECO: 2030 Effective Date: 5/11/06                    Reference: HR-0004-A, Physician Training

Distributor Agreement-BelConcrintcrnationalLtd-China-FINAL-090206     Page 37 of 38                    Initial: ____

## EXHIBIT E
## FIELD SOFTWARE UPGRADE (VER 3.28)
## (FM-0195 Rev A)

Purpose:     Document a Field upgrade of the RF Generator.
Type of Upgrade:    Software
Work Instruction Requirement: P/N 30229 Rev B or higher
Form must be returned to: Thermage Customer Service.

Physician: _____ Date: _____

Expandable Physician ID:_____

Address: _____

_____

RF Generator Serial Number: _____

Upgrade Components: Software CD-ROM/Programmed Flash Card with Software Version 3.28 – PN# 41450 or
Other (list):_____

Status of Upgrade:

Software:

☐   Install complete & Verified:  Comments _____

☐   Deviation:   Comments_____

☐   Verify that Technical User's Manual/Binder 40636 (US), 40404 (Canada), or other (Non-US) at site.

☐   Verify that the Return Pad Cable is intact (no breaches or exposed wires)
    Thermage Representative: _____ Date: _____

    Thermage QA Review: _____ Date: _____

☐   Expandable updated with new software rev level: By: _____ Date:_____

cc:    RFG Device History File
    Stellartech

CONFIDENTIAL: Don Not Copy Without Permission From Thermage

ECO: 1743    Effective Date: 10/4/05    Originator: A. Schupe  Page 1 of 1    Reference: 30229

Initial: _____